1  ERIN J. COX (State Bar No. 267954)
   Erin.Cox@mto.com
2  BRANDON E. MARTINEZ (State Bar No. 318749)
   Brandon.Martinez@mto.com
3  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue
4  Fiftieth Floor
   Los Angeles, California 90071-3426
5  Telephone:  (213) 683-9100
   Facsimile:   (213) 687-3702
6
   Attorneys for Defendant The Walt Disney Company
7

8

9              UNITED STATES DISTRICT COURT

10     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12 | HOWARD M. EHRENBERG, Chapter | Case No. 2:22-CV-01136-SB-SK
   | 7 Trustee; JEFFREY SCOTT, an |
13 | individual, | **DEFENDANT THE WALT DISNEY**
   | | **COMPANY'S NOTICE OF**
14 |              Plaintiffs, | **MOTION AND MOTION TO**
   | | **DISMISS COUNTS ONE**
15 |     vs. | **THROUGH FOUR, SIX, AND**
   | | **SEVEN OF PLAINTIFFS' SECOND**
16 | THE WALT DISNEY COMPANY, | **AMENDED COMPLAINT UNDER**
   | | **FED. R. CIV. P. 12(b)(6)**
17 |              Defendant. |
   | | **[Request for Judicial Notice filed**
18 | | **concurrently herewith]**
19
   **Judge:** Hon. Stanley Blumenfeld, Jr.
20
   **Date:**   September 16, 2022
21 **Time:**   8:30 A.M.
   **Place:**  Courtroom 6C
22
   **Action Filing Date:** February 18. 2022
23

24

25

26

27

28

1    TO PLAINTIFFS HOWARD M. EHRENBERG, CHAPTER 7 TRUSTEE, AND
2    JEFFREY SCOTT AND THEIR COUNSEL OF RECORD:

3    PLEASE TAKE NOTICE that on September 16, 2022, at 8:30 A.M., or as soon
4    thereafter as the matter may be heard, in Courtroom 6C of this Court, located at 350 West
5    1st Street, Los Angeles, California 90012, Defendant The Walt Disney Company
6    ("Defendant" or "Disney") will and hereby does move pursuant to Federal Rule of Civil
7    Procedure 12(b)(6) for an order dismissing with prejudice the first through fourth, sixth,
8    and seventh causes of action asserted in the Second Amended Complaint of Plaintiffs
9    Howard M. Ehrenberg, Chapter 7 Trustee ("Trustee") and Jeffrey Scott ("Scott" and,
10   together with Trustee, "Plaintiffs") on the grounds that those counts fail to state any claim
11   upon which relief can be granted.

12   This Motion is made following the conference of counsel pursuant to Central
13   District Local Civil Rule 7-3, which took place most recently on August 1, 2022, during
14   which counsel thoroughly discussed the substance and potential resolution of the filed
15   motion by telephone.  During that conference, and confirmed by email between counsel,
16   the parties agreed upon a briefing schedule leading to the September 16 hearing such that
17   Plaintiffs' opposition papers would be filed on Monday, August 22, 2022, and
18   Defendant's reply papers would be filed on Friday, September 2, 2022.  This Motion is
19   based on the files, records, and proceedings in this action, this Notice, the following
20   Memorandum of Points and Authorities, Defendant's Request for Judicial Notice
21   ("RJN") and accompanying exhibits filed concurrently therewith, the reply memoranda
22   that Defendant intends to file in support of this Motion, the arguments of counsel, and
23   such other matters as may be presented at the hearing on this Motion or prior to the
24   Court's decision.

25

26

27

28

1   DATED:  August 8, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MUNGER, TOLLES & OLSON LLP
    ERIN J. COX
    BRANDON E. MARTINEZ


By:  _____/s/ Erin J. Cox_____
            Erin J. Cox

Attorneys for Defendant The Walt Disney
    Company

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ...................................................................... 1

II.   BACKGROUND ...................................................................... 2

    A.   Jim Henson's Muppets and *Muppet Babies* ............................... 2

    B.   Disney Reboots *Muppet Babies*. ............................................ 3

    C.   Scott Registers His Alleged Copyrights and Sues Disney. ............... 4

III.  Plaintiffs' Copyright, Implied-Contract, and Fraud Claims Fail. ........... 5

    A.   Plaintiffs Have Yet Again Failed to Plead Substantial Similarity Between the Protectable Elements of Scott's Alleged Works and the *Muppet Babies* Reboot. .................................................... 5

    B.   Scott's Revised Breach of Implied-Contract Claim Fails. ............... 11

        1.   Scott Has Failed Once Again to Plead an Implied Contract. .......... 12

        2.   The *Muppet Babies* Reboot Shares No Substantial Similarity to the Ideas Scott Purportedly Pitched in 2016. .................. 14

        3.   Scott's Implied-Contract Claim Is Time-Barred. .................. 16

    C.   Scott Still Has Failed to Plead a Viable Fraud Claim with Particularity. ...................................................... 18

IV.   CONCLUSION ...................................................................... 19

DEFENDANT THE WALT DISNEY COMPANY'S MOT. TO DISMISS UNDER FED. R. CIV. P. 12(b)(6)

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abdullah v. Walt Disney Co.*,
  2016 WL 5380930 (C.D. Cal. Mar. 14, 2016)......................................................8

*Aliotti v. R. Dakin & Co.*,
  831 F.2d 898 (9th Cir. 1987) ........................................................................12, 13

*Becerra v. Dr Pepper/Seven Up, Inc.*,
  945 F.3d 1225 (9th Cir. 2019) ............................................................................19

*Benay v. Warner Bros. Entertainment, Inc.*,
  607 F.3d 620 (9th Cir. 2010) ..................................................................6, 14, 16

*Berkic v. Crichton*,
  761 F.2d 1289 (9th Cir. 1985) ..................................................................6, 7, 10

*Bernal v. Paradigm Talent & Literary Agency*,
  788 F. Supp. 2d 1043 (C.D. Cal. 2010) .............................................................8, 9

*Campbell v. Walt Disney Co.*,
  718 F. Supp. 2d 1108 (N.D. Cal. 2010)................................................................8

*Carlini v. Paramount Pictures Corp.*,
  2021 WL 911684 (C.D. Cal. Feb. 2, 2021) .......................................................6, 9

*Cavalier v. Random House, Inc.*,
  297 F.3d 815 (9th Cir. 2002) .............................................................................7, 9

*Daniels v. Walt Disney Co.*,
  958 F.3d 767 (9th Cir. 2020) .........................................................................12, 14

*Funky Films, Inc. v. Time Warner Entertainment Co.*,
  462 F.3d 1072 (9th Cir. 2006) ..............................................................................6

*Green v. Harbach*,
  2018 WL 3350329 (S.D.N.Y. July 9, 2018)........................................................10

*Jordan-Benel v. Universal City Studios, Inc.*,
  2015 WL 9694896 (C.D. Cal. Feb. 13, 2015) ...............................................12, 13

# TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Kouf v. Walt Disney Pictures & Television*,
    16 F.3d 1042 (9th Cir. 1994) ...................................................................7

*Litchfield v. Spielberg*,
    736 F.2d 1352 (9th Cir. 1984) ...............................................................6

*Marcus v. ABC Signature Studios, Inc.*,
    2017 WL 4081885 (C.D. Cal. Sept. 13, 2017) ......................................8

*McDonald v. K-2 Industries, Inc.*,
    108 F. Supp. 3d 135 (W.D.N.Y. 2015) .................................................11

*Narell v. Freeman*,
    872 F.2d 907 (9th Cir. 1989) .................................................................8

*Schkeiban v. Cameron*,
    2012 WL 5636281 (C.D. Cal. Oct. 4, 2012) ........................................10

*Scott v. The Walt Disney Company*,
    2:20-CV-09709-SB-SK (C.D. Cal.) ........................................................4

*Shame on You Productions, Inc. v. Banks*,
    120 F. Supp. 3d 1123 (C.D. Cal. 2015) ..............................................6, 9

*Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*,
    562 F.2d 1157 (9th Cir. 1977) ...............................................................6

*Stewart v. Abend*,
    495 U.S. 207 (1990) ...............................................................................7

*U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*,
    692 F.3d 1009 (9th Cir. 2012) ...............................................................7

*UMG Recordings, Inc. v. Glob. Eagle Entertainment, Inc.*,
    117 F. Supp. 3d 1092 (C.D. Cal. 2015) .............................................18, 19

*VMG Salsoul, LLC v. Ciccone*,
    824 F.3d 871 (9th Cir. 2016) ................................................................16

# TABLE OF AUTHORITIES
## (Continued)

**Page(s)**

**STATE CASES**

*Desny v. Wilder*,
   46 Cal. 2d 715 (1956) ..................................................................12, 14

*Faris v. Enberg*,
   97 Cal. App. 3d 309 (1979) .........................................................12, 13

*Spinner v. Am. Broadcasting Cos.*,
   215 Cal. App. 4th 172 (2013) ......................................................12, 16

*Thompson v. California Brewing Co.*,
   191 Cal. App. 2d 506 (1961) .......................................................16, 17

**FEDERAL STATUTES**

17 U.S.C. § 103(b) ...............................................................................7

**FEDERAL REGULATIONS**

37 C.F.R. § 202.1(a) .............................................................................8

**FEDERAL RULES**

Fed. R. Civ. P. 9(b) .....................................................................2, 5, 18

Fed. R. Civ. P. 12(b)(6).........................................................................5

**STATE STATUTES**

Cal. Civ. Proc. Code § 339(1)..............................................................16

**TREATISES**

4 Nimmer on Copyright § 19D.07[D] ..................................................16

## I.   <u>INTRODUCTION</u>

Between this action, and prior related actions in state and federal court, Plaintiffs have had numerous opportunities to allege facts to support their copyright, implied-contract, and promissory-fraud claims in connection with Disney's 2018 *Muppet Babies* reboot.  When this Court dismissed these claims from Plaintiffs' First Amended Complaint with leave to amend, it explained in detail how the allegations were deficient and took pains to "caution[]" Plaintiffs that, if the revised allegations of their Second Amended Complaint ("SAC") once again fell short, the claims were liable to be dismissed with prejudice.  (Dkt. 45 ("Prior MTD Ruling") at 13.)  Plaintiffs have now had a final opportunity to cure their defective pleadings, but the new allegations they offer only confirm that they have not—and cannot—allege facts that could entitle them to relief.

*First*, given that Scott did not create Jim Henson's Muppets characters or the idea of presenting them as babies in a nursery with fantastical imaginations, the claim that Disney's *Muppet Babies* reboot infringes Scott's purported copyrights is premised on nothing but scattered similarities that are unprotectable *scenes-a-faire*.  Plaintiffs' latest allegations still fall short of the substantial similarity necessary to move past the pleading stage.

*Second*, Scott has once again failed to plead a viable claim for breach of an implied contract under which Disney would pay him for sharing ideas in 2016 for the *Muppet Babies* reboot.  His new allegations confirm that if there were any understanding between Disney and Scott regarding compensation, it was that Scott was pitching his ideas in order to be considered for a position as a writer for the reboot and would be paid only if he were hired as a writer.  Additionally, Scott has failed to allege that the reboot is substantially similar to the new ideas he allegedly shared with Disney in 2016.  His pitch was essentially a rehash of the original *Muppet Babies* series, except for the non-substantial element of the Nanny's socks changing between episodes.  Regardless of its merits, this claim is also time-barred as a matter of law.

1    *Finally*, despite this Court's admonition that "the nature of Scott's fraud claim is

2    not clear" and that "it fails to satisfy Rule 9(b)'s requirements at least to the extent it

3    purports to allege an express misrepresentation," (Prior MTD Ruling at 12), Scott has yet

4    again failed to plead facts with particularity that could show Disney's intent not to be

5    bound by a promise at the time of formation—the essence of promissory fraud—or an

6    express misrepresentation.

7    **II.      BACKGROUND**

8         **A. Jim Henson's Muppets and *Muppet Babies***

9         Jim Henson originated his iconic Muppet characters in the 1950s; the Muppets

10   gained a nationwide television audience in the following decades and appeared on the big

11   screen in motion pictures.  (Request for Judicial Notice ("RJN"), Exs. C-1–C-2.)  Their

12   third film, *The Muppets Take Manhattan*, was filmed in the summer of 1983.  (*Id.*, Exs.

13   A-1, C-3–C-5.)  The film featured a dream sequence in which the adult Muppet

14   characters—Kermit, Miss Piggy, Gonzo, and others—were shown as toddlers together in

15   a nursery setting, singing and engaging in imaginative adventures.  For instance, while

16   scaling a crib, baby Miss Piggy imagines climbing the Matterhorn.  (*Id.*, Ex. A-1 at

17   50:51–54:36.)

18        *Jim Henson's Muppet Babies*, an animated cartoon television series produced by

19   Marvel Productions Ltd. ("Marvel") in affiliation with Henson Associates, Inc. ("HA")

20   from 1984 to 1991, expanded on this depiction of the Muppets as babies.  Plaintiffs allege

21   that "Marvel obtained Scott's services to create a series production bible and write scripts

22   for a new Muppet-based television show, depicting the Muppet characters as youngsters."

23   (SAC ¶¶ 3, 14.)  The show bible is dated April 6, 1984, and bears Marvel's and HA's

24   names on the cover page.  (*Id.*, Ex. 1.)  The show bible explicitly describes its goal as

25   simply repackaging the existing, copyrighted Muppet characters as babies:  "THE

26   MUPPET BABIES . . . are exactly that.  All of those wonderful Muppet characters we've

27   grown to love . . . as babies."  (*Id.* at 2 (original ellipses).)  Each maintained "the unique

28

character traits of their adult selves," and, as in *The Muppets Take Manhattan*, carried out imaginary adventures in a children's nursery.  (*Id.*)

## B. Disney Reboots *Muppet Babies*.

In November 2014, Scott allegedly "proposed" to Lisa Henson, the president of HA, a non-Disney entity now known as the Jim Henson Company, that Disney "produce new *Muppet Babies* shows."  (SAC ¶ 16.)  Henson connected Scott with a vice president at Disney's The Muppets Studio, who purportedly told Scott that Disney was already planning to re-release the original *Muppet Babies* series and "expressed interest" in rebooting it, too.  (*Id.* ¶ 17.)  Over a year later, in early 2016, Scott allegedly met with two Disney executives and, allegedly at their request, shared "his ideas" for a reboot.  (*Id.* ¶ 18.)

But what Scott proposed was that Disney simply re-fashion the old *Muppet Babies* series using Disney's newer animation technology.  In a three-page pitch document attached to the SAC, Scott urged: "If it ain't broke, don't fix it!"  (SAC, Ex. 3 at 1.)  The "basic structure of the series should remain the same," Scott recommended; "update the animation" to "look[] like a 2017 production" with "Pixar-Disney quality CG," he said, and "revise a few of its elements to make them fit better in today's world."  (*Id.* at 1-3.)  In addition to his pitch document, Scott allegedly gave the Disney executives copies of some of his scripts for the original *Muppet Babies* series.  (SAC ¶ 18.)  According to Scott, he had a history of pitching or submitting story ideas to Disney, "which Disney subsequently paid him to write."  (*Id.* ¶ 92.)  Scott does not allege he had ever previously been paid by Disney merely for the sharing of a story idea in the first instance—rather, he offered his ideas as a way to present himself as a contender to be hired as a screenwriter.  (*Id.*)

Disney's new computer-animated *Muppet Babies* series received extensive media attention and promotion, including by Disney and its affiliates, beginning in October 2016, long before the reboot's launch on March 23, 2018.  (SAC ¶ 47; RJN, Exs. B-1–B-14, C-6.)

## C. <u>Scott Registers His Alleged Copyrights and Sues Disney</u>.

In late October 2019, three years after Disney's *Muppet Babies* reboot was widely publicized, Scott registered a purported copyright for the 1984 production bible.  (*See* SAC, Ex. 2.)  Three months later, on January 31, 2020, Disney agreed to toll the statutes of limitations for any *Muppet Babies*-related claims Scott may have against it until September 4, 2020.  (SAC ¶ 48.)  When the parties entered into the tolling agreement at the end of January 2020, the two-year limitations period on Scott's implied-contract claim had already run.  Several months later, Scott registered purported copyrights in scripts he allegedly wrote for the 1980s *Muppet Babies* series.  (*See* SAC ¶ 22 & Ex. 4.)

On October 22, 2020—approximately six weeks after the parties' January 2020 tolling agreement expired—Scott filed the first Related Case in this Court, *Scott v. The Walt Disney Company*, 2:20-CV-09709-SB-SK ("Related Case").  (SAC ¶ 49.)  In that action, Scott asserted, among other things, that the reboot of the *Muppet Babies* infringed his purported copyright in the 1984 production bible for the original *Muppet Babies* series.  (*See* Related Case, Dkt. 1 ¶¶ 27-51.)  In March 2021, this Court dismissed the Related Case without prejudice, finding that Scott had "failed to properly schedule his purported copyright or other related interest in the production bible" in bankruptcy court and that he consequently had "no ownership interest in the Work or its purported copyrights." (*Id.,* Dkt. 31 at 6.)

In February 2022, after Scott reopened his bankruptcies to amend his asset schedules, the Trustee commenced the above-captioned action, asserting copyright claims for alleged infringement of Scott's 1984 production bible as well as scripts Scott wrote for the 1980s *Muppet Babies* series; the Trustee also asserted claims requesting declarations that it co-owns Disney's 2018 *Muppet Babies* reboot.  (*See* Dkt. 1 ¶¶ 28-48.) Pursuant to a stipulation between the parties (*see* Dkt. 18), on April 15, 2022, the Trustee amended the complaint in this action to add Scott as a plaintiff and to include Scott's state-law claims.  (*See* Dkt. 20 (FAC).)

On July 15, 2022, this Court granted in part and denied in part Disney's motion to

dismiss the First Amended Complaint.  (*See generally* Prior MTD Ruling.)  The Court held that the allegations were "insufficient to plausibly allege substantial similarity" between the 1980s bible and scripts and the reboot and gave Plaintiffs the opportunity to file an amended complaint "that contains more detailed allegations of substantial similarity to support their infringement claims."  (*Id.* at 9.)  Regarding Scott's implied-contract claim, the Court concluded that, because Plaintiffs "represent[ed]" to the Court "that they have additional relevant facts to allege with respect to [that] claim, the best course [was] to allow Plaintiffs to replead before determining whether they are able to state a plausible claim for breach of implied contract."  (*Id.* at 10-11.)  Finally, the Court held that "the nature of Scott's fraud claim [was] not entirely clear from the FAC" and "fail[ed] to satisfy Rule 9(b)'s requirements at least to the extent it purport[ed] to allege an express misrepresentation."  (*Id.* at 11-12.)  The Court dismissed those copyright, implied-contract, and fraud claims under Rule 12(b)(6) with leave to amend but warned Plaintiffs that "if Disney moves to dismiss Plaintiffs' SAC for failure to state a claim, the Court does not expect to allow Plaintiffs again to amend their pleading to add allegations that could have been included in their SAC."[1]  (*Id.* at 13.)

## III.  Plaintiffs' Copyright, Implied-Contract, and Fraud Claims Fail.

### A.  Plaintiffs Have Yet Again Failed to Plead Substantial Similarity Between the Protectable Elements of Scott's Alleged Works and the *Muppet Babies* Reboot.

The Trustee's copyright claims fail for lack of substantial similarity between the protectable elements of Scott's alleged contributions to the bible and scripts and the *Muppet Babies* reboot as a whole.  To prevail on those claims, the Trustee bears the burden of pleading and proving that, after "an objective comparison of specific expressive elements," "the protectable elements [of the purportedly infringed work],

---

[1] The Court declined to dismiss Plaintiffs' fifth cause of action, the Trustee's claim for breach of Scott's alleged 1980s contract with Marvel regarding his services on the original *Muppet Babies* series.  (Prior MTD Ruling at 9-10.)  While Disney does not contest the sufficiency of that claim in this motion, it reserves its right to contest that claim at later stages of the case.

standing alone, are substantially similar" to the purportedly infringing work in "plot, themes, dialogue, mood, setting, pace, characters, and sequence of events." *Benay v. Warner Bros. Ent., Inc.*, 607 F.3d 620, 624 (9th Cir. 2010), *overruled on other grounds by Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1065-69 (9th Cir. 2020). Before performing this analysis, the Court must "filter out and disregard the non-protectable elements" of the allegedly infringed work. *Funky Films, Inc. v. Time Warner Ent. Co.*, 462 F.3d 1072, 1077 (9th Cir. 2006), *overruled on other grounds by Skidmore*, 952 F.3d at 1065-69. The inquiry "compares[] not the basic plot ideas . . . but the actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Id.* (quoting *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985)). The inquiry is "fact-specific" but "may often be decided as a matter of law." *Benay*, 607 F.3d at 624 (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977)); *see also, e.g.*, *Carlini v. Paramount Pictures Corp.*, 2021 WL 911684, at *9 & n.4 (C.D. Cal. Feb. 2, 2021) (Blumenfeld, J.), *aff'd*, 2022 WL 614044 (9th Cir. Mar. 2, 2022). "The Ninth Circuit is 'particularly cautious [in finding substantial similarity] where [a] list [of perceived similarities] emphasizes random similarities scattered throughout the works.'" *Shame on You Prods., Inc. v. Banks*, 120 F. Supp. 3d 1123, 1151 (C.D. Cal. 2015) (quoting *Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984)).

*First,* Plaintiffs cannot claim copyright over the bible's or the scripts' depictions of "those wonderful Muppet characters we've grown to love . . . as babies" with all "the unique character traits of their adult selves." (SAC, Ex. 1 at 2.) The Muppets, as well as the "Muppets as babies" concept, was already developed by HA before Scott was approached by Marvel. HA had already presented the Muppets as babies in a toy-filled nursery, and depicted them ideating and singing about imaginary adventures, in *The Muppets Take Manhattan*—the production of which preceded Scott's preparation of the 1984 production bible. (*See* RJN, Exs. A-1 at 50:51–54:36, C-3–C-5.) Indeed, *The Muppets Take Manhattan* featured (a) the Muppets as babies (b) in a nursery (c) singing a

musical number (d) accompanied by the character Rowlf's piano while (e) sharing an imaginative fantasy (f) in which another character pretends to be a mountain climber, (*see* RJN, Ex. A-1 at 50:51–54:36), a scenario Scott simply copied into the *Muppet Babies* bible, (*see* SAC, Ex. 1 at 18-23, 24-25, 28). "[W]here the copyright owner has authorized a third party to prepare a derivative work based on the owner's pre-existing work, copyright protection in the derivative work will cover only 'the material contributed by the author of such work, as distinguished from the preexisting material employed in the work.'" *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1016 (9th Cir. 2012) (quoting 17 U.S.C. § 103(b)) (citing *Stewart v. Abend,* 495 U.S. 207, 223 (1990) ("The aspects of a derivative work added by the derivative author are that author's property, but the element drawn from the pre-existing work remains on grant from the owner of the pre-existing work.")).

    *Second,* the similarities which Plaintiffs have identified from a handful of episodes in the new allegations of their SAC are either (1) scattered similarities which cannot plausibly support a claim of *substantial* similarity; (2) *scenes-a-faire* that flow from the idea of depicting the Muppets as babies with imagined adventures; or (3) "[g]eneral plot ideas . . . not protected by copyright law." *Berkic*, 761 F.2d at 1293; *see also, e.g.*, *Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002) ("[T]hemes that are staples of literature are not protected."); *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045-46 (9th Cir. 1994) ("We attach no significance to the fact that both works involve a life struggle of kids fighting insurmountable dangers, because general plot ideas are not protected by copyright law." (Court's alterations adopted; internal quotation marks omitted)).

    ***Characters:***  Plaintiffs acknowledge that "Jim Henson originally envisioned the Nanny character," but they nonetheless claim that Scott "created" the Nanny character in the show bible by presenting her as an adult woman rather than as a Muppet.  (SAC ¶ 25.)  Scott's alleged contribution in this regard is not protectable, as a nanny character is one of those "characters which naturally flow from a 'basic plot idea'"—here, a show

-7-

about unrelated babies spending time in a nursery—and which are therefore "'scenes-a-faire' not protected by copyright." *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1115 (N.D. Cal. 2010); *see also, e.g.*, *Abdullah v. Walt Disney Co.*, 2016 WL 5380930, at *7 (C.D. Cal. Mar. 14, 2016) ("A castle with guards is a *scene a faire* in fairy tales."). Plaintiffs also claim that Scott "created Animal's main character attribute—that he is mess prone," (SAC ¶ 27), but Scott cannot claim a monopoly on the idea of a pre-existing character named Animal being messy. "[B]asic human traits . . . are too general or too common to deserve copyright protection." *Marcus v. ABC Signature Studios, Inc.*, 2017 WL 4081885, at *10 (C.D. Cal. Sept. 13, 2017) (internal quotation marks omitted).

***Dialogue:*** The alleged overlap in dialogue Plaintiffs identify boils down to short phrases or quips, often uttered by different characters in different contexts. However, "[o]rdinary words and phrases are not entitled to copyright protection, nor are 'phrases or expressions conveying an idea typically expressed in a limited number of stereotyped fashions.'" *Bernal*, 788 F. Supp. 2d at 1071 (quoting *Narell v. Freeman*, 872 F.2d 907, 911-12 (9th Cir. 1989)); 37 C.F.R. § 202.1(a) (excluding from copyright protection "[w]ords and short phrases such as names, titles, and slogans").

At most, the SAC identifies only a few phrases of dialogue in entire episodes of the reboot that they contend are similar to phrases found in "Scott's scripts." The examples offered by Plaintiffs are the phrase "Go bye-bye!" used by Animal (SAC ¶ 26; *id.* ¶ 42 (only alleged similarity in dialogue in entire reboot episode)); the sole word "Renoir" in a reboot episode (*id.* ¶ 37); different characters referring to hearing a song by royal musicians in another reboot episode (*id.* ¶ 38); different characters saying "aye-aye Captain," "sea monster," "land ho," and the reference to finding treasure in a reboot episode, based on a subset of those words appearing across three of "Scott's scripts" (*id.* ¶ 39); use of the words "art," "takeoff," and "cookies" in another reboot episode, based on a subset of those words appearing in two of "Scott's scripts" (*id.* ¶ 44); and repeated use of the word "rules" in another reboot episode (*id.* ¶ 45). In one reboot episode, there are no examples of purportedly similar dialogue. (*See id.* ¶ 43.) In the remaining reboot

episodes discussed in the SAC, the purportedly similar dialogue is not, in fact, even superficially similar.  (*See, e.g., id.* ¶ 40 (alleging that "Where could it have gone?" is similar to "I don't understand it"); *id.* ¶ 41 (alleging that Piggy saying "We don't need a Sport-A-Thon.  We can have a Sport-A-Thon" is similar to Kermit saying "I was thinking maybe we could pretend to make our own TV show.")  This falls far short of the "[e]xtended similarity of dialogue" that substantial similarity requires.  *Carlini*, 2021 WL 911684, at *14.

**_Theme and Mood_:**  Plaintiffs do not articulate any similarity in theme or mood that is protectable.  Allegations that the show bible "created the theme that Gonzo's fantasies would 'likely spring from a comic book he was reading,'" (SAC ¶ 29), or "the theme of the characters incorporating the everyday items around them into their fantasies," (*id.* ¶ 34), cannot contribute to a finding of substantial similarity.  *See Cavalier*, 297 F.3d at 828 ("The themes of teaching children to have confidence, to overcome their fears, and to try are not only too general to be protected but are also standard topics in children's literature."); *Shame On You*, 120 F. Supp. 3d at 1158-62 ("A general mood that flows 'naturally from unprotectable basic plot premises is not entitled to protection.").

**_Setting_:**  The nursery setting for the reboot was featured in *The Muppets Take Manhattan*, (*see* RJN, Ex. A-1 at 50:51–54:36), and plainly is not Scott's to claim.  Moreover, a nursery setting is an unprotectable *scene-a-faire* "flow[ing] directly from the basic premise."  *Shame On You*, 120 F. Supp. 3d at 1151-52.  Even the bible refers to the nursery as "generic."  (SAC, Ex. 1 at 24.)

**_Plot, Sequence of Events, Pace_:**  The vast majority of the purported similarities Plaintiffs identify relate to the reboot's depiction of the Muppet Babies' fantasies, but *The Muppets Take Manhattan* had already depicted the Muppets as babies engaging in and singing about imaginary adventures.  (*See* RJN, Ex. A-1 at 50:51–54:36.)  And "the use of 'magical adventures,' a stock plot device, [is not] protect[a]ble."  *Cavalier*, 297 F.3d at 828; *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1072 (C.D. Cal. 2010) ("[S]equence of events refers to the actual sequence of the scenes, not just

1  having similar scenes out of sequence."). Even if they were original, "[g]eneral plot

2  ideas are not protected by copyright law." *Berkic*, 761 F.2d at 1293; *see also Schkeiban*

3  *v. Cameron*, 2012 WL 5636281, at *2 (C.D. Cal. Oct. 4, 2012), *aff'd*, 566 F. App'x 616

4  (9th Cir. 2014) (granting motion to dismiss where, "even though the two works overlap, a

5  closer inspection reveals very different stories, and [the p]laintiff's compilations of

6  random similarities scattered throughout the works are insufficient *scenes a faire*.").

7       Plaintiffs also impermissibly attempt to mix and match random details belonging to

8  different characters—sometimes from numerous different scripts—in order to

9  manufacture the semblance of similarity. *See, e.g.*, *Green v. Harbach*, 2018 WL

10  3350329, at *6 (S.D.N.Y. July 9, 2018) (rejecting claim of substantial similarity where

11  plaintiff "mixe[d] and matche[d] characters and plot lines" to support his copyright

12  claim), *aff'd*, 750 F. App'x 57 (2d Cir. 2019). For instance, the reboot episode "Boo

13  Bamboozle" is alleged to infringe the script Scott allegedly wrote entitled "Kermit Goes

14  to Washington," but the only purported similarity offered is that in the reboot a character

15  known as "Jill the frog" is in a castle wearing a crown, asking for royal entertainment,

16  and in Scott's script Piggy does so. (SAC ¶ 38.) This single act alleged to be "similar"—

17  by different characters, no less—does not constitute a plot, much less a sequence of

18  events.

19       Plaintiffs' attempts to suggest that a single reboot episode could copy the plot and

20  sequence of events from multiple different scripts written by Scott lead to a similar

21  conclusion: pointing to discrete plot points scattered across multiple works does not

22  support a claim of similarity in plot or sequence of events. Consider Plaintiffs' allegation

23  that a single reboot episode entitled "Sir Kermit the Brave" copies from (and, to be

24  actionable, is substantially similar to) four of "Scott's scripts." (SAC ¶ 40.) A closer

25  review, and a bit of common sense, shows that this single reboot episode does not, and

26  cannot, be substantially similar to each of these four different scripts. The only similarity

27  between this reboot episode and Scott's "Treasure Attic" script is that Nanny loses an

28  object (different in each) and looks for it in a closet; the only similarity with Scott's

"Good Clean Fun" script is that characters hear a sound (in the reboot, a roar in a cave, in Scott's script, a gurgle in a pipe) and that there is a reference to the sound of an empty stomach; the only similarity with Scott's "Once Upon an Egg Timer" script is an imagining of a "'Raiders of the Lost Ark' style traps waiting" for the characters, and a movement by Kermit (different in each) which engages with a trap (different in each); and the only similarity with Scott's "Who's Afraid of the Big Bad Dark" script is a character (different in each) who is afraid of the dark, and an object (different in each) mitigates that fear. (*Id.*)

For another reboot episode the SAC alleges is similar to four of "Scott's scripts," the only alleged similarity with one script is the image of a Viking ship at sea, with another script it is an allusion to Caesar (a painting in the reboot, the title of Emperor claimed by Gonzo in Scott's script), and with another it is an allusion to Mark Antony. (SAC ¶ 42.) Plaintiffs cannot aggregate random similarities spread across multiple of Scott's claimed scripts to insinuate actionable copying. *See McDonald v. K-2 Indus., Inc.*, 108 F. Supp. 3d 135, 143 (W.D.N.Y. 2015) ("Plaintiff presents no authoritative case law supporting her theory that such allegations of aggregated copyright infringement are cognizable."). (*Cf.* SAC ¶¶ 39 (comparing a single reboot episode to three of "Scott's scripts," including a script alleged to be similar to a different reboot episode listed in Paragraph 40), 41 (comparing a single reboot episode to two of "Scott's scripts"), 43 (comparing a single reboot episode to three of "Scott's scripts," including scripts alleged to be similar to different reboot episodes listed in Paragraphs 37, 40, and 44), 44 (comparing a single reboot episode to two of "Scott's scripts," including one alleged to be similar to three other reboot episodes); *see also id.* ¶¶ 38, 45 (comparing two different reboot episodes to a single script claimed by Scott).)

## B. Scott's Revised Breach of Implied-Contract Claim Fails.

Controlling precedent forecloses Scott's "*Desny* claim" for breach of an implied-in-fact contract purportedly entitling him to compensation for allegedly disclosing ideas for the *Muppet Babies* reboot to Disney in 2016. To prevail, Scott must plead and prove

that: (1) he "clearly conditioned the submission of [his] ideas on an obligation to pay for any use of [his] ideas"; (2) Disney, "knowing this condition before [Scott] disclosed the ideas, voluntarily accepted the submission of the ideas"; and (3) Disney "found the ideas valuable and *actually used* them—that is, . . . based [its] work substantially on [Scott's] ideas, rather than on [its] own ideas or ideas from other sources." *Spinner v. Am. Broad. Cos.,* 215 Cal. App. 4th 172, 184 (2013); *see generally Desny v. Wilder*, 46 Cal. 2d 715 (1956). Scott cannot plead these elements conclusorily with "bare allegations, stripped of relevant details"; he must plead both "dates" and "details." *Daniels v. Walt Disney Co.*, 958 F.3d 767, 775 (9th Cir. 2020).

Scott's latest allegations confirm that he offered his ideas for a reboot to Disney for the chance to be considered as a screenwriter on the reboot—not that he was seeking compensation for the mere submission of the ideas themselves. This is consistent with Scott's historical dealings with Disney, as alleged in the SAC. Nor is there substantial similarity between any new ideas Scott allegedly offered in 2016 and the reboot. In any event, the claim is barred by the statute of limitations as a matter of law.

## 1.   Scott Has Failed Once Again to Plead an Implied Contract.

The SAC does not carry Scott's burden to plead facts that could support an implied contract. Bare allegations that an idea was disclosed to studio executives consistent with "customs and practices in the entertainment industry" are "insufficient . . . to support an implied-in-fact contract." *Daniels*, 958 F.3d at 769, 774-75. Importantly, "no contract may be implied where an idea has been disclosed . . . for the sole purpose of inducing the defendant to enter a future business relationship." *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902 (9th Cir. 1987); *Jordan-Benel v. Universal City Studios, Inc.*, 2015 WL 9694896, at *2 (C.D. Cal. Feb. 13, 2015) (proposed business relationship cannot give rise to implied contract for sale of idea (citing *Aliotti*)); *Faris v. Enberg*, 97 Cal. App. 3d 309, 318-19 (1979) (same principle). For example, in *Aliotti*, the Ninth Circuit affirmed summary judgment for the defendant where the plaintiff, a toy designer, showed ideas for stuffed dinosaurs to a potential acquirer of the toy manufacturer for whom the plaintiff

1    worked, hoping to persuade the potential acquirer either to buy the toy manufacturer or
2    offer the plaintiff employment. *Aliotti*, 831 F.2d at 899, 902-03. Because a *Desny* claim
3    cannot lie where the plaintiff disclosed her ideas to "induc[e] the defendant to enter a
4    future business relationship," the plaintiff's implied-contract claim failed as a matter of
5    law. *Id.*

6         Scott's new allegations in the SAC state that he was "an experienced writer who
7    was well known to Disney" with a "history of being paid for his material," (SAC ¶¶ 91-
8    92) and that he had pitched a movie and several "story premises" to Disney since the
9    1980s, "which Disney subsequently paid him to write," (*id.* ¶ 92). But these allegations
10   regarding the parties' prior course of dealing only confirm that Scott pitched his thoughts
11   on a reboot to win a screenwriter's job, not because he and Disney understood that he
12   would be paid for submitting the ideas in the first place. Thus, to the extent the SAC
13   pleads facts showing that there was *any* understanding on Disney's part when Scott
14   pitched his ideas for the *Muppet Babies* reboot in 2016, it was that Scott would submit his
15   reboot ideas and be paid only if Disney hired him to *write* the reboot—not that he would
16   be paid merely for submitting those ideas at all or if those ideas were exploited by Disney
17   down the road.[2] *See, e.g.*, *Jordan-Benel*, 2015 WL 9694896, at *2 (a plaintiff's
18   "unilateral" expectation or understanding is insufficient; a plaintiff must plead facts "to
19   show that [defendant] voluntarily accepted the conveyance [if ideas] on the condition that
20   it had an obligation to pay for it," "the heart of the [*Desny*] claim"). Scott's hope or
21   expectation of "subsequently" being "paid . . . to write" the *Muppet Babies* reboot
22   precludes an implied contract as a matter of law. *See Aliotti*, 831 F.2d at 902-03; *Faris*,
23   97 Cal. App. 3d at 318-19.

24        The SAC's new references to alleged statements on Disney's website that Disney

---

25

26   [2] Indeed, Scott's detailed allegations that he was paid to write screenplays for Disney
     only "subsequent[]" to having submitted ideas for them, (SAC ¶ 92), flatly contradicts his
27   allegation that "when [Disney] solicited and accepted submissions, it paid for them," (*id.*
     ¶ 91)—a conclusory allegation for which Scott provides no other potentially supporting
28   facts.

1  does not "accept unsolicited submissions of creative material" to "avoid the possibility of
2  future misunderstandings" (SAC ¶ 91) fail to fortify Scott's claim. For one thing, Scott
3  overstates the import of those alleged statements, which provide only that Disney does
4  not "accept unsolicited submissions," (*id.*), not that Disney necessarily assumes an
5  obligation to pay for the mere submission of ideas it allegedly has solicited. And in any
6  case, whether Disney solicited Scott's alleged ideas for the reboot makes no difference:
7  even assuming Scott had a "history of being paid for his material" solicited by Disney,
8  his own allegations reflect that that "material" consisted of screenplays for productions
9  on which he had "subsequently" been engaged as a writer, not the mere pitching of ideas.
10  (*Id.* ¶ 92.)

11      Finally, the SAC's references to "television industry custom and practice" and
12  "Disney's practice with respect [to] idea submissions that it requests and accepts" (SAC
13  ¶ 90) are precisely the kind of bare allusions to "customs and practices in the
14  entertainment industry" that *Daniels* held insufficient to establish an implied-in-fact
15  contract as a matter of law. *See Daniels*, 958 F.3d at 769, 774-75.

16  ### 2.  The *Muppet Babies* Reboot Shares No Substantial Similarity to the
17      Ideas Scott Purportedly Pitched in 2016.

18      Scott's implied-contract claim fails for yet another reason: As a matter of law, the
19  supposedly new and different ideas he allegedly pitched to Disney in 2016 bear no
20  substantial similarity to Disney's *Muppet Babies* reboot. To prevail on a *Desny* claim, a
21  plaintiff must plead and prove "'substantial similarity' between [the] plaintiff's idea and
22  [the] defendant's production to render [the] defendant liable." *Benay*, 607 F.3d at 631
23  (citation omitted). Because the only ideas that can form the consideration for an implied
24  contract are those that were not already known to Disney in 2016, *Desny,* 46 Cal. 2d at
25  739, and because "copying less than substantial material is non-actionable," *Benay* 607
26  F.3d at 631, Scott bears the burden of showing that Disney's reboot is substantially
27  similar to *new* ideas that Scott allegedly disclosed in 2016.

28      The vast majority of the ideas Scott purportedly pitched to Disney in 2016 were

either already featured in the original series or contained in the 1984 production bible. Notwithstanding the SAC's conclusory allegation that "Scott's ideas were different from those contained in his scripts and bible," (SAC ¶ 19), Scott's 2016 pitch document begins with the bold and italicized slogan "*If it ain't broke, don't fix it!*" and proceeds to make clear that, in Scott's imagining, the reboot would simply regurgitate elements from 32 years earlier that were already available to Disney:

- "[I]t is only necessary to update the animation so that it looks like a 2017 production, and revise a few of its elements to make them fit better in today's world."
- "The basic structure of the series should remain the same . . . . This is what made the original series a classic and should not be changed."
- "As before, all of our stories will take place in the Muppet Babies' imaginations."
- "[The Babies] should not be redesigned, but simply modeled in CG to look as closely like the original 2D characters as possible. . . . Like the Babies, their home should also be upgraded from 2D to rich, Pixar-Disney quality CG."
- "We can keep [the nanny character] visible from the socks down as before."

(SAC, Ex. 3 at 1-3.)  Although the SAC alleges that Scott proposed that the nursery setting be "updat[ed]" into "a house," the 2016 pitch document attached to the SAC actually proposed "changing the[] nursery to a preschool," (SAC, Ex. 3 at 2)—an idea not incorporated into the reboot, which kept the nursery setting.  (*See, e.g.*, RJN, Ex. A-2 (reboot Season 1, Ep. 1) at 1:12-3:57.)  In any event, the original nursery was always part of a larger house, and Scott's allegation in the SAC that his 2016 pitch suggested including "things like books, a table, a play area, arts supplies, easels, and other furnishings" as well as an "outdoor playground" (SAC ¶ 19) is also not a new idea. Those ideas had already been disclosed in the 1984 bible attached to the SAC, which explicitly suggested that the Muppet Babies be shown in a "nursery/playroom" inside of a "house" with "playthings," including "toys," a "blackboard," a "toy chest," "books," and other "furniture," supplies for "fingerpainting," and a "backyard" featuring a "swing set with slide, sandbox . . . , a giant tree and treehouse, as well as all the other things you might find in a child's backyard," (*id.*, Ex. 1 at 24-25, 27; *see also id.* at 29 (referencing Muppet Babies using "paint cans, rollers and ladders"), 33 (suggesting that plot may

-15-

1  "take the Muppet Babies out of the nursery and into some other rooms of the house")).

2  Of the ideas in Scott's 2016 pitch materials that were conceivably new and

3  different, moreover, Scott has failed to plausibly allege, as he must, that Disney "actually

4  used them" in the reboot—that is, "based [its] work substantially on [his] ideas, rather

5  than on [its] own ideas or ideas from other sources," *Spinner,* 215 Cal. App. 4th at 184.

6  Specifically, Scott proposed "changing the[] nursery to a preschool," (SAC Ex. 3 at 2),

7  but the reboot kept the nursery setting, (*see, e.g.*, RJN, Ex. A-2 (reboot Season 1, Ep. 1)

8  at 1:12-3:57).  Scott proposed renaming the Nanny character to "Franny"—another idea

9  which was not used in the reboot—and casting a "younger, hipper female voice like

10  Selena Gomez, Taylor Swift, [or] Daisy Ridley," well-known pop stars and a *Star Wars*

11  starlet, none of whom voiced Nanny in the reboot.  (SAC, Ex. 3 at 3; *see also* RJN, Ex.

12  B-5, B-7, B-9–B-11.)

13  The only purportedly new and different idea that Scott has left—his alleged

14  suggestion that the Nanny character's "socks change in different episodes," (SAC ¶ 19)—

15  is far too "meager and fragmentary" an element of the *Muppet Babies* reboot to establish

16  substantial similarity between Scott's alleged pitch and the reboot.  *See, e.g.*, *VMG*

17  *Salsoul, LLC v. Ciccone*, 824 F.3d 871, 878 (9th Cir. 2016) (citation omitted).

### 3.  Scott's Implied-Contract Claim Is Time-Barred.

19  In addition to failing on its merits, Scott's implied-contract claim is barred because

20  he did not assert it within two years of its accrual.  *See* Cal. Civ. Proc. Code § 339(1)

21  (providing that any "action upon a contract, obligation or liability not founded upon an

22  instrument of writing" must be filed "[w]ithin two years").  A *Desny* claim accrues, and

23  the statute of limitations begins to run, on the date the defendant first discloses the

24  plaintiff's idea to "a substantial segment of the public."  *Benay*, 607 F.3d at 633 (citing 4

25  Nimmer on Copyright § 19D.07[D]; *Thompson v. Cal. Brewing Co.*, 191 Cal. App. 2d

26  506, 510 (1961)); *see also* Prior MTD Ruling at 11 (noting that statute of limitations for

27  *Desny* claim triggered when "the particular ideas shared by Scott were disclosed to the

28  public").

1   Scott first asserted his *Desny* claim in the first federal lawsuit he filed on October

2   22, 2020.  (*See* Related Case, Dkt. 1 ¶¶ 41-47.)  Accounting for the tolling agreement that

3   ran from January 31 to September 4, 2020 (and assuming *arguendo* that the limitations

4   period has been tolled since the filing of Scott's first federal lawsuit), Scott may recover

5   on his *Desny* claim only if it accrued on or after March 20, 2018.  But Disney and others

6   broadly disclosed to the public the ideas Scott allegedly shared with Disney for a *Muppet*

7   *Babies* reboot—and Scott's claim therefore accrued—well before this date.  No later than

8   October 2016, it was public knowledge that a computer-animated, or "CG," *Muppet*

9   *Babies* reboot was set to air on Disney Junior in 2018.  (*See* RJN, Exs. B-1–B-4.)  By

10   February 2018, mainstream, industry, and fan-based media sources had reported that

11   Jenny Slate (an actress in her 30s) had been cast to voice the Nanny character, and at least

12   three sources reported that the Nanny character would, as in the original series, "only be

13   seen from the torso down" but that the pattern on her tights would "change in each

14   episode to reveal the story's theme"—one of the chief ideas the SAC alleges Scott

15   pitched to Disney.  (*See* RJN, Ex. B-7; *see also id.* Exs. B-5–B-11.)  The reboot, these

16   media sources reported, would be "[s]et in the vibrant playroom of an urban brownstone

17   with an expansive backyard" and feature fantasies "told from the babies' perspective" to

18   "encourage creative thinking and imagination."  (*Id.,* Exs. B-5–B-11, C-6; *see also* SAC

19   ¶¶ 18-19.)  Disney itself, moreover, promoted the reboot extensively before March 20,

20   2018, including by publishing teasers on YouTube in February 2018 exhibiting both the

21   backyard play area and the fantasies referenced in Scott's 2016 pitch document.  (RJN,

22   Ex. B-12–B-14; SAC, Ex. 3 (pitch document).)  Many of these materials exhibited books,

23   a table, art supplies, an easel, and other furnishings in the Muppet Babies' play area of

24   the same kind the SAC claims Scott pitched to Disney.  (*See, e.g.*, RJN, Exs. B-3, B-4, B-

25   6, B-9, B-11; SAC ¶¶ 18-19.)

26   As a matter of law, these disclosures of Scott's supposed ideas "to a substantial

27   segment of the public . . . certainly destroy[ed] any further marketability of the idea[s]"

28   and caused Scott's implied-contract claim to accrue before March 2018.  *See Thompson,*

1   191 Cal. App. 2d at 510 (extensive "test" advertising in San Diego and Sacramento

2   triggered limitations period on implied-contract claim because it "immediately disclosed

3   the idea to a substantial segment of the public," thereby "destroy[ing] any further

4   marketability of the idea").

5          **C.** __Scott Still Has Failed to Plead a Viable Fraud Claim with Particularity__.

6          Scott continues to allege that "Disney executives falsely represented that Disney

7   would pay him for his ideas for elements of the reboot and consider offering him an

8   opportunity to work on or otherwise be involved with the reboot for compensation" (SAC

9   ¶ 98)—an allegation that the Court observed "suggests an affirmative statement by

10  Disney that it would pay Scott for his ideas, but the FAC does not identify 'the who,

11  what, when, where, and how' of any such statement." (Prior MTD Ruling at 12.)  In

12  response, Scott has added new allegations that a Disney executive sent an email in March

13  2016 asking for a "one sheet on the new creative direction [Scott] intend[s] to take with

14  the show" to "help us move the project forward." (SAC ¶ 97.)  The substance of this new

15  allegation—purporting to address the who, what, when, and where required by Rule

16  9(b)—does not contain an "affirmative statement by Disney that it would pay Scott for

17  his ideas." (Prior MTD Ruling at 12.)  Thus, Scott continues to fail to satisfy Rule 9(b)'s

18  requirement that a claim for promissory fraud "state with particularity the circumstances

19  constituting fraud or mistake."

20         To the extent Scott argues that his claim is premised not on a false representation

21  but rather a failure to disclose an intent not to comply with an implied agreement for

22  payment, his promissory-fraud claim still fails.  First, as discussed in Part III.B above,

23  Scott has failed to allege an implied agreement adequately.  Second, Scott cannot state a

24  claim for promissory fraud without "point[ing] to facts which show that [the] defendant

25  harbored an intention not to be bound by [the] terms of the contract at formation." *UMG*

26  *Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1109-10 (C.D. Cal.

27  2015) (citations omitted).  "[I]ntent not to perform cannot be proved simply by showing a

28  subsequent failure to perform." *Id.* at 1109 (collecting cases); (Prior MTD Ruling at 11

-18-

("To satisfy Rule 9(b), parties must allege 'the who, what, when, where, and how of the misconduct charged.'" (quoting *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228 (9th Cir. 2019))).  Scott has offered nothing in his SAC to address this deficiency. Whether Disney executives asked Scott to submit a brief statement of "the creative direction [Scott] intend[s] to take with the show" (SAC ¶ 97) fails to show that a contract was formed with Scott, let alone that the executives intended to breach any such alleged contract at the moment of formation.

Scott contends that the Disney executives "had no intention of 'moving forward' with Scott" or "offering Scott an opportunity to work on the reboot or to pay him for his ideas," (SAC ¶ 97), but once again makes no effort to plead any details supporting his theory that the Disney executives with whom he allegedly spoke in early 2016 furtively "harbored an intention not to be bound by [the] terms" of whatever contract they purportedly formed with Scott—other than, perhaps, Disney's alleged failure to perform under that contract, which as a matter of law does not suffice.  *UMG*, 117 F. Supp. 3d at 1109-10.  If anything, Scott's sole new allegation on his fraud claim—that a Disney executive asked Scott to "send us a one sheet on the new creative direction you intend to take with the show" to "help us move the project forward," (SAC ¶ 97)—shows at most that Disney solicited a submission from Scott for evaluative purposes but ultimately decided not to engage him as a writer on the reboot, not that it indicated assent to a contract requiring it to "move the project forward" *with him* or that it assented to such a contract with a contemporaneous intention not to perform.  Scott's revised allegations cannot bootstrap what was a mere rejection of him as a writer into full-blown fraud, *UMG*, 117 F. Supp. 3d. at 1109.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Second Amended Complaint's first through fourth, sixth, and seventh causes of action with prejudice.

DATED:  August 8, 2022

MUNGER, TOLLES & OLSON LLP
ERIN J. COX
BRANDON E. MARTINEZ

By:  _____
_____*/s/ Erin J. Cox*_____
Erin J. Cox

Attorneys for Defendant The Walt Disney
Company