1  KING, HOLMES, PATERNO & SORIANO, LLP
   HOWARD E. KING, ESQ., STATE BAR NO. 77012
2  STEPHEN D. ROTHSCHILD, ESQ., STATE BAR NO. 132514
   SROTHSCHILD@KHPSLAW.COM
3  1900 AVENUE OF THE STARS, TWENTY-FIFTH FLOOR
   LOS ANGELES, CALIFORNIA 90067-4506
4  TELEPHONE:   (310) 282-8989
   FACSIMILE:   (310) 282-8903
5
   Attorneys for Plaintiffs Howard M.
6  Ehrenberg, Chapter 7 Trustee, and Jeffrey
   Scott
7

8

9              UNITED STATES DISTRICT COURT

10     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

11

12 HOWARD M. EHRENBERG, Chapter     | CASE NO. 2:22-cv-01136-SB (SKx)
   7 Trustee; and JEFFREY SCOTT,    |
13                                  | The Hon. Stanley Blumenfeld, Jr.
                  Plaintiffs,       |
14                                  | **PLAINTIFFS' OPPOSITION TO
        vs.                         | DEFENDANT'S MOTION TO
15                                  | DISMISS SECOND AMENDED
   The Walt Disney Company,         | COMPLAINT; MEMORANDUM
16                                  | OF POINTS AND AUTHORITIES**
                  Defendant.        |
17                                  | [Filed concurrently with objections to
                                    | request for judicial notice]
18                                  |
                                    | Date:     September 16, 2022
19                                  | Time:     8:30 a.m.
                                    | Crtrm.:   6C
20                                  |
21 ─────────────────────────────────| **Action Filing Date:** February 18, 2022

22        Plaintiffs Howard M. Rosenberg, Chapter 7 Trustee (the "Trustee") and

23 Jeffrey Scott ("Scott") (collectively, "plaintiffs") respectfully submit the following

24 memorandum of points and authorities in support of their opposition to defendant

25 The Walt Disney Company's ("Disney") motion to dismiss plaintiffs' second

26 amended complaint (the "SAC").

27 / / /

28 / / /

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ............................................................................. 1

II.   STATEMENT OF FACTS ............................................................... 2

III.  SUBSTANTIAL SIMILARITY ...................................................... 3

      A.    *Alfred v. Disney* Requires Denial of Disney's Motion Because Discovery and Expert Testimony Will Aid in the Substantial Similarity Analysis ................................................................... 4

      B.    Disney's Premature Filtration Analyses Fail to Establish, as a Matter of Law, that Scott's Contributions Were Not Original .............. 7

            1.    Characters ............................................................ 7

            2.    Dialogue .............................................................. 8

            3.    Theme and Mood ................................................ 8

            4.    Setting ................................................................. 9

            5.    Plot, Sequence of Events, Pace ......................... 9

IV.  IDEA MISAPPROPRIATION ....................................................... 10

V.   FRAUDULENT CONCEALMENT ............................................... 15

VI.  CONCLUSION .............................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Federal Cases</u>

*4Bowl, LLC v. AMF Bowling Worldwide, Inc.*
  2012 WL 13008127 ................................................................ 11

*Abdullah v. Walt Disney Company*
  2016 WL 5380930 (C.D. Cal. 2016) ......................................... 7

*Alfred v. Walt Disney Co.*
  821 F.Appx. 727 (9th Cir. 2020) ..................................... 4, 5, 7

*Aliotti v. R. Dakin & Co.*
  831 F.2d 898 (9th Cir. 1987) .................................................. 11

*Benay v. Warner Bros. Entertainment, Inc.*
  607 F.3d 620 (9th Cir. 2010) .................................................. 13

*Bernal v. Paradigm Talent & Literary Agency*
  788 F.Supp.2d 1043 (C.D. Cal. 2010) ...................................... 8

*Carlini v. Paramount Pictures Corp.*
  2021 WL 911684 (C.D. Cal. 2021) ........................................... 5

*Cavalier v. Random House, Inc.*
  297 F.3d 815 (9th Cir. 2002) ................................................ 8, 9

*Cooley v. Penguin Group (USA) Inc.*
  31 F.Supp.3d 599 (S.D.N.Y. 2014) ........................................ 14

*Evans v. NBC Universal Media, LLC*
  2021 WL 4513624 .................................................................... 5

*Green v. Harbach*
  2018 WL 3350329 (S.D.N.Y. 2018) ....................................... 10

*Jones v. Twentieth Century Studios, Inc.*
  2021 WL 6752228 (C.D. Cal. 2021) ......................................... 5

*Jordan-Benel v. Universal City Studios, Inc.*
  2015 WL 9694896 (C.D. Cal. 2015) ....................................... 11

*Lyons v. Michael & Associates*
   824 F.3d 1169 ................................................................................ 14

*McDonald v. K-2 Industries, Inc.*
   108 F.Supp.3d 135 ........................................................................ 10

*Newton v. Diamond*
   388 F.3d 1189 (9th Cir. 2004) ....................................................... 4

*Quirk v. Sony Pictures Ent., Inc.*
   2013 WL 1345075 (N.D. Cal. 2013) ............................................ 14

*Summit Kaiju LLC v. Legend Pictures, LLC*
   2022 WL 2235460 (C.D. Cal. 2022) .............................................. 5

*VMG Salsoul, LLC v. Ciccone*
   824 F.3d 871 (9th Cir. 2016) ....................................................... 15

*Woodall v. Walt Disney Co.*
   2021 WL 2982305 (C.D. Cal. 2021) ........................................ 4, 5

**<u>State Cases</u>**

*Faris v. Enberg*
   97 Cal.App.3d 309 (1979) ............................................................ 11

*Gunther-Wahl Productions, Inc. v. Mattel, Inc.*
   104 Cal.App.4th 27 (2002) ........................................................... 13

*Irish Rover Entertainment, LLC v. Sims*
   2021 WL 408199 (C.D. Cal. 2021) ................................................ 5

*Minniear v. Tors*
   266 Cal.App.2d 495 (1968) .......................................................... 13

*Spinner v. American Broadcasting Companies, Inc.*
   215 Cal.App.4th 172 (2013) ......................................................... 15

*Thompson v. California Brewing Co.*
   150 Cal.App.2d 469 ...................................................................... 13

KING, HOLMES,
PATERNO &
SORIANO, LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

This Court's July 15, 2022, order on Disney's motion to dismiss the first amended complaint and the Court's comments during the hearing included specific instructions to both sides.

On copyright, the Court instructed the Trustee to allege examples of specific infringements exemplifying substantial similarity, and held that the Trustee had sufficiently alleged originality.  The Court instructed Disney that it was not going to do a filtration analysis at the motion to dismiss stage.  (Ex. 1, Transcript, 22:5-17.)  The directives were consistent with settled Ninth Circuit authority that, in cases involving multiple elements, substantial similarity cannot be adjudicated without evidence, including expert testimony--precedent that Disney ignores even though it was the defendant in the case that announced the rule.

The SAC addresses the Court's ruling.  It alleges episode- and scene- specific examples of Disney copying Scott's scripts and elements of his bible in its *Muppet Babies* reboot.  Disney's instant motion disregards the ruling and controlling authority by attempting to retest originality and reargue filtration.  Even if the Court were inclined to consider those improper analyses, Disney offers no authority to establish, as a matter of law, that its cherrypicked examples and Scott's original, award winning arrangements of them and Scott's other elements are not protectible.

On idea misappropriation, the Court provided Scott the opportunity to expand on his allegations.  The SAC does so, alleging exactly why the parties understood that Scott's ideas were being presented for compensation, including their prior dealings; Disney's well known policy that it does not accept idea submissions unless they are solicited; and the specific written and oral communications in which Disney solicited Scott's ideas.  Disney's argument, that discussions of possible employment negate that a submission is for compensation, ignores Ninth Circuit and California authority that the form of proposed compensation is not determinative.

1    On fraud, the Court instructed Scott to allege the "who, when, where and
2    how" of Disney's fraudulent misrepresentations.  The TAC alleges the specific
3    Disney executives who fraudulently induced Scott to submit his ideas by soliciting
4    them and concealing that they had no intent to pay him or offer him the opportunity
5    to work on a reboot and had already started a team that did not include Scott to
6    develop the reboot, that they did so in a March 4, 2016, email and at an in-person
7    meeting in early March 2016, and the specific words Disney used in the email.

8    Finally, although the Court denied Disney's motion to dismiss on statute of
9    limitations grounds, Disney repeats the same argument, now in the context of its
10   motion to dismiss Scott's idea misappropriation claim.  The argument fails for the
11   same reasons it did before.

12   **II.    STATEMENT OF FACTS**

13   The relevant background is in the Court's order on Disney's earlier motion to
14   dismiss.  Most important for this motion:

15   1.      Originality/Protectability.  On Disney's first motion to dismiss, the
16   Court held, "[a]t this pleading stage, Plaintiffs have adequately alleged that Scott
17   made at least some original nontrivial contributions, including the creation of a
18   wholly new character (Nanny) and details about the relationship and dynamics
19   among the characters."  [DE 45, p. 8]

20   2.      Substantial Similarity.  In its order on the prior motion, the Court noted
21   the "short and plain statement" pleading requirement, and held that it "does not
22   expect Plaintiffs' pleading to identify every example of alleged copying," but
23   granted leave to amend to allege "more detailed allegations of substantial similarity
24   to support their infringement claims."  [DE 45, p. 9]

25   3.      Filtration analysis.  At the hearing on the prior motion, the Court
26   advised that it did not intend to undertake a filtration analysis, consistent with its
27   already having ruled on originality.  (Ex. 1, Transcript, 25:5-17.)

28   4.      Idea Misappropriation.  The Court did not rule on Disney's motion and

gave Scott the opportunity to expand on his allegations that an implied contract existed, which he has done.  The additional allegations in the SAC include Disney's own policy advisory to people who want to submit creative material, that it does not accept unsolicited submissions.  Those allegations further demonstrate that both Disney and Scott both understood that Disney could not use Scott's ideas without compensating him.  [DE 45, p. 11]

     5.   <u>Fraud</u>.  The Court granted leave to amend to allege the "who, what, when, where, and how" of Scott's allegation that "the Disney executives falsely represented that Disney would pay him for his ideas for elements of the reboot and consider offering him the opportunity to work on the reboot in good faith."  The SAC alleges the email and meeting in which named Disney executives solicited material from Scott and told him they were "moving forward with the project" he had proposed.

## III.   SUBSTANTIAL SIMILARITY

     As a preliminary matter, Disney's motion does not challenge all of the similarities identified in the examples alleged in the SAC.  It does not address all of the plot points, gags, or dialogue in alleged in paragraphs 37-45, nor does it address all of the elements from the bible attached to the SAC as Exhibit 1 that Disney used in its reboot and alleged in paragraphs 24-35 of the SAC.  It does not address the way the characters relate to each other, the unique aspects of the nanny character, the nature of Kermit's fantasies, the visual look of the show and its incorporation of existing film and television footage, photographs and other material, or its design themes.  Accordingly, for purposes of the instant motion, the Trustee has stated sufficient facts to state his claims for relief for copyright infringement.

/ / /

/ / /

/ / /

/ / /

KING, HOLMES, PATERNO & SORIANO, LLP

3

A. ***Alfred v. Disney*** **Requires Denial of Disney's Motion Because Discovery and Expert Testimony Will Aid in the Substantial Similarity Analysis**

Recognizing that it cannot credibly argue that it did not interpolate elements of Scott's scripts and bible in the reboot, Disney's substantial similarity arguments ask the Court to engage in the "filtration" analysis that the Court stated it was not going to do at this stage. Disney's filtration arguments fail to acknowledge controlling Ninth Circuit law, set forth in a case in which it was the defendant, *Alfred v. Walt Disney Co.*, 821 F.Appx. 727, 729 (9th Cir. 2020). There, Disney (represented by the same law firm as in this case) had successfully argued on a motion to dismiss that plaintiff's pirate script was not substantially similar to *Pirates of the Caribbean* because the similarities were "unprotected, generic, pirate-movies tropes," just as Disney now argues with respect to Scott's work. The Ninth Circuit reversed because the district court did not "compare the original selection and arrangement of unprotectible elements between the two works." The court also held that a substantial similarity determination of what elements are protectible should be deferred until after discovery, including expert discovery, as follows:

> The district court noted some of these similarities but dismissed the action largely because it concluded that many of the elements the two works share in common are unprotected generic, pirate-movie tropes. But, at this stage of the litigation, it is difficult to know whether such elements are indeed unprotectible material. Additional evidence would help inform the question of substantial similarity. Cf. *Rentmeester [ v. Nike, Inc.\ ]*, 883 F.3d [1111] at 1123 [9th Cir. 2018] ("This is not a case in which discovery could shed light on any issues that actually matter to the outcome."). As Plaintiffs note, expert testimony would aid in determining whether the similarities Plaintiffs identify are qualitatively significant. See *Newton v. Diamond*, 388 F.3d 1189, 1196 (9th Cir. 2004). This would be particularly useful in this circumstance, where the works in question are almost twenty years old and the blockbuster Pirates of the Caribbean film franchise may itself have shaped what are now considered pirate-movie tropes.

Numerous cases in the short time since the court decided *Alfred* have followed it. In *Woodall v. Walt Disney Co.*, 2021 WL 2982305 *5 (C.D.Cal. 2021),

plaintiff alleged that Disney's *Moana* infringed his animated film projects.  The court denied Disney's motion to dismiss, including as to substantial similarity, holding as follows:

> Defendants also contend the Court should dismiss Plaintiff's copyright infringement claim because the works are not substantially similar as a matter of law. In *Alfred v. Walt Disney Co.*, the Ninth Circuit held the district court erred in finding the parties' works were not substantially similar as a matter of law under the extrinsic test in granting the defendant's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), reasoning "[a]dditional evidence would help inform the question of substantial similarity" and "expert testimony would aid in determining whether the similarities Plaintiffs identify are qualitatively significant." 821 F. App'x at 729. Therefore, consistent with the Ninth Circuit's opinion in *Alfred v. Walt Disney Co.*, the Court finds additional evidence such as expert testimony may help inform the question of substantial similarity in this case. Id. Accordingly, the Court denies Defendants' motion to dismiss Plaintiff's copyright infringement claim (First Cause of Action) at this stage.

See also *Irish Rover Entertainment, LLC v. Sims*, 2021 WL 408199 *2 (C.D.Cal. 2021) (same, denying motion to dismiss claim that *Stranger Things* infringed plaintiff's screenplay based on same holding in *Alfred* as relied on in *Woodall*); *Summit Kaiju LLC v. Legend Pictures, LLC*, 2022 WL 2235460 * 4 (C.D.Cal. 2022) (same, on motion to dismiss plaintiff's claim that *Godzilla: King of the Monsters* infringed his character design); *Jones v. Twentieth Century Studios, Inc.*, 2021 WL 6752228 *5 (C.D.Cal. 2021) (same, on motion to dismiss plaintiff's claim that *Ad Astra* infringed his script); *Evans v. NBC Universal Media, LLC*, 2021 WL 4513624 *5 n. 11 (C.D.Cal. 2021) (noting the *Alfred* rule, and granting leave to amend on substantial similarity where plaintiff failed to attach his screenplay or alleged the elements he claimed defendants infringed).[1]

---

[1] This Court's decision in *Carlini v. Paramount Pictures Corp.*, 2021 WL 911684 (C.D.Cal. 2021), decided after *Alfred*, is inapposite, as it appears that the parties to that case did not raise *Alfred* in their briefing in the trial court and have not done so on appeal, and that this Court found that the lack of substantial similarity was so evident that discovery and expert testimony could not have changed the result.

KING, HOLMES,
PATERNO &
SORIANO, LLP

1    *Alfred* and its progeny are particularly applicable to this case.  Scott's bible

2    and scripts created what Disney now argues are tropes, and Disney ignores Scott's

3    selection, arrangement and coordination of the elements he created, whether those

4    elements, with the aid of discovery and expert testimony, are deemed original,

5    scenes-a-faire, or derivative.[2]  Discovery and expert testimony will yield evidence

6    that Scott's contributions, including his humorous takes on and parodies of elements

7    that Disney now deems unoriginal, were new and groundbreaking when Scott

8    created them.

9    Expert testimony will also show that Scott's arrangement, coordination and

10    selection of elements, and the absurd twists he added to them, were original and

11    exceptionally creative, as the *Muppet Babies*' 1985, 1986, and 1987 Daytime Emmy

12    Awards for Outstanding Children's Animated Program recognized.[3]  For example,

13    while Disney is correct that guards in castles are standard fare, it cites no story, fairy

14    tale, comic book, novel, film, tv show, or other work in which a conceited baby pig

15    tells them what to do.  That juxtaposition, which Scott created, was unprecedented,

16    challenged expectations, and unexpectedly humanized both the pig and the guards in

17    / / /

18    / / /

19    / / /

20    / / /

21    / / /

22    / / /

23    

_____

24    [2] If this Court permits Disney to attempt to distinguish *Alfred* in its reply, plaintiffs

25    request an opportunity to respond to any argument that Disney may make and that
     the Court exercises its discretion to consider concerning that controlling authority.

26    [3]See

27    https://en.wikipedia.org/wiki/Daytime_Emmy_Award_for_Outstanding_Children%
     27s_Animated_Program.  Unlike *Muppet Babies* during the Scott years, the reboot

28    did not win any "outstanding program" or "series" awards.

1    an entirely new way for the show's young audience, while also appealing to a more

2    adult sense of the absurd.

3    **B.      Disney's Premature Filtration Analyses Fail to Establish, as a
         Matter of Law, that Scott's Contributions Were Not Original[4]**

4        **1.      Characters**

5

6    Disney's argument on characters is essentially that the Court should filter out

7    non-protectable elements—an analysis that is premature and that this Court has

8    already stated it will not engage in at this stage.  Expert testimony will explain how

9    the Nanny character that Scott created is much more than the generic nanny that

10   Disney describes at page 7 of its motion (and very different from the "ogre" that Jim

11   Henson initially proposed).  Among other things, Scott invented her colorful socks,

12   made her human, and created the attribute that she would only be seen from the

13   waist down and from the Muppet Babies' point of view.  (SAC, ¶ 25.)  Scott's

14   original elements transcend a generic nanny.

15   The case that Disney cites for the proposition that castle guards are generic,

16   *Abdullah v. Walt Disney Company*, 2016 WL 5380930 (C.D.Cal. 2016), illustrates

17   why Scott's guards and other contributions are protectable, particularly at the

18   pleadings stage.  In *Abdullah*, plaintiff argued that because both works had castle

19   guards, defendant copied plaintiff's work.  The Court held that how the guards were

20   portrayed—the non-scene-a-faire-elements of the characters, were different and,

21   therefore, that defendant did not copy plaintiff.  In this case, the unique manner in

22   which Scott portrayed the guards, and their role in the plot and action, added unique,

23   protectable elements.  That principal applies to Animal too.  Scott did not merely

24   make him "mess prone," Scott created his signature catchphrase, "Animal go bye-

25   bye," and how the other characters respond to him and his messiness.  (SAC ¶¶ 26,

26   _____

27   [4] Plaintiffs address these arguments out of an abundance of caution, but assert that
     they are improper due to the Court's admonition that it was not going to conduct a
28   filtration analysis at this stage of the proceedings, and based on *Alfred v. Disney*.

44.)  Moreover, this is not a case where two authors created separate characters with generic similarities.  The reboot uses the same character, Animal, with the attributes that Scott created, selected, arranged and coordinated.

### 2.    Dialogue

Disney's argument on Dialogue and reliance on *Bernal v. Paradigm Talent & Literary Agency*, 788 F.Supp.2d 1043 (C.D.Cal. 2010) fail to address that it is Scott's selection, arrangement and coordination of "ordinary words" that is protected, not the words themselves without regard to how Scott orchestrated them. Animal says "Renoir" in the reboot episode "You Out to Be in Pictures" in the same setting and context, and in the same sequence of events, as he did in Scott's original "The Muppet Museum" script.  The characters look at a sequence of nearly identical artworks in both episodes, and Animal says "Renoir" in the same circumstances and for the same effect in both episodes.  While people often say the word "Renoir" when they visit museums, portraying the scruffiest Muppet saying the artist's name is emblematic of the original irony and comic juxtaposition that Scott created for the Emmy-winning version of *Muppet Babies*.

Disney misconstrues the purpose of other dialogue alleged in the SAC, such as their reactions to the action in paragraphs 37, 38, 39, 40, 41, 44 and 45.  Those excerpts are alleged because they demonstrate how Disney interpolated Scott's original selection, arrangement and coordination of scenes, interactions, gags, "bits," character attributes, and other elements, including dialogue.  Paragraph 37 details episodes in which the characters view the same art from the same period by the same artists and react in the same ways, including Animal humorously exclaiming "Renoir."  Paragraphs 37, 38, 39, 40, 41, 44 and 45 all allege bits that Disney lifted directly, changing them only slightly but using the same pacing, plot points, character interactions, and incidents.

### 3.    Theme and Mood

In relying on *Cavalier v. Random House, Inc.*, 297 F.3d 815 (9th Cir. 2002),

Disney again ignores that Scott added, arranged, selected and coordinated original attributes that transcend any allegedly stock elements.  Moreover, Disney has provided no authority for its filtration argument, that fantasies springing from comic books is a stock element, and cites no precedent for the theme of characters creating fully immersive fantasies (not magical adventures that are supposed to be real in the fictional setting where they take place) from everyday items.  Determining the protectability of those elements requires discovery and expert testimony.

### 4.   Setting

Disney also argues filtration with respect to the nursery, relying on the 3 ½ minute nursery scene in *Muppets Take Manhattan.*  In addition to being premature, the argument fails to acknowledge the new elements that Scott added to the nursery, including art supplies, using everyday objects as springboards for and elements of the characters' fantasies, a back yard, beginning and ending each episode in the nursery, seeing and portraying the nursery from the Muppet Babies' point of view, and turning the house where the nursery is located into a fantasyland where anything can happen, limited only by the characters' imaginations.

### 5.   Plot, Sequence of Events, Pace

Again arguing premature filtration, Disney contends that Scott's plot elements and innovations are taken from *Muppet Takes Manhattan* and are stock ideas. *Muppet Takes Manhattan*'s 3 ½ minute nursery sequence did not involve imaginary adventures remotely like those that Scott created.

Moreover, Disney's argument again confuses generalized ideas with their unique execution.  In fact, *Cavalier v. Random House, Inc.*, 297 F.3d 815, 828 (9th Cir. 2002) a summary judgment case which Disney relies on for the proposition that the generic idea of magic adventures may not be original, recognized the distinction between "stock plot devices," and their protectible execution, noting that "[a]lthough depictions or descriptions of a child riding a dragon, glowing badges, star trees, checklists, and schools in the sky could be protected, these elements are

1  not protectible as abstract ideas."  *Id.*  Scott's work was not abstract, it was detailed

2  and concrete.

3       Scott's bible did not merely say that the characters would have "magical

4  adventures," or even use the words "magical" and "adventure".  It created a

5  template whereby "the thrust of the series will be the imaginations and fantasies of

6  the Muppet Babies, and how these fantasies differ (sometimes drastically) from one

7  character to another."  (SAC Ex. 1, bible, p. 1.)  The "fantasies" are entirely

8  imaginary, not "real" adventures in the context of the story and not magical.

9  Starting at page 18 of the bible, Scott went into several pages of great detail,

10  describing the details of each character's unique fantasy "style," plotting various

11  fantasies, and creating details for each character's fantasies that mirror the

12  character's psychology and personality—which Disney used in the reboot.  (Ex. 1,

13  pp. 18-23; see ¶ 39.)

14       Disney's argument, that using elements of more than one work in an

15  infringing work is not actionable copyright infringement, is unsupported by any

16  authority and is absurd on its face.  There is no rule that immunizes infringers who

17  use only parts of a protected work, or who use parts of a number of protected work

18  in a single infringing work.  The only cases that Disney cites to support its

19  argument, *Green v. Harbach*, 2018 WL 3350329 (S.D.N.Y. 2018) and *McDonald v.*

20  *K-2 Industries, Inc.* 108 F.Supp.3d 135, 143, are not to the contrary.  Those courts

21  were commenting on the cases before them and cited no authority for their

22  comments.  In addition, plaintiffs located no Ninth Circuit or other authority citing

23  those cases for those propositions, and the comments on which Disney relies were

24  not the reason for finding lack of substantial similarity in those cases.

25  **IV.   IDEA MISAPPROPRIATION**

26       Disney's argument, that Scott cannot recover for idea misappropriation

27  because he disclosed his ideas "for the sole purpose" of inducing Disney to enter

28  into a "future business relationship," misapprehends the allegations in the SAC and

KING, HOLMES,
PATERNO &
SORIANO, LLP

10

1   the cases upon which Disney relies.

2   The SAC does not allege that Scott presented his ideas for a "business

3   relationship" such as those at issue in the cases that Disney cites.  The cases Disney

4   cites hold that the specific business relationships at issue did not constitute

5   compensation for ideas.  In *Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902 (9th Cir.

6   1987), plaintiff submitted her ideas "not to sell her designs herself but to help

7   persuade [defendant] to buy [her company]."  Scott was not trying to sell a business,

8   he was attempting to obtain compensation for his ideas.  Contrary to Disney's

9   characterization, the court in *Aliotti* did not disqualify potential employment as

10  "compensation" for an idea.  Rather, the court held that "[e]ven if we accept the

11  premise that Dakin assumed that by hiring Aliotti it could obtain designs that

12  apparently belonged to Favorite Things, the uncontradicted evidence indicates that

13  Aliotti displayed the dolls before Dakin executives suggested that their company

14  might consider hiring her."  *Id.*  In *Faris v. Enberg*, 97 Cal.App.3d 309 (1979),

15  plaintiff presented his idea to induce defendant to participate in a production, not to

16  sell defendant the idea.  In *Jordan-Benel v. Universal City Studios, Inc.*, 2015 WL

17  9694896 *2 (C.D. Cal. 2015), the court ruled against plaintiff because plaintiff did

18  not allege any facts showing that defendant understood that plaintiff's idea was

19  being submitted for compensation.  (*Id.*, "Benel's FAC does not allege that

20  defendant UTA knew and accepted the condition of the submission. The allegations

21  by Benel are that only two exchanges occurred: Peck sent the screenplay, and Davis

22  indicated he'd 'pass.'")

23  In fact, "business relationships" do qualify as compensation in idea

24  misappropriation cases, and there is no case that holds that a writer's understood

25  compensation cannot include a job developing his idea or working on a production

26  of his idea.  Indeed, in *4Bowl, LLC v. AMF Bowling Worldwide, Inc.,* 2012 WL

27  13008127, *5-6, the court held that a business relationship can be "compensation"

28  for purposes of idea misappropriation, as follows:

In *Montz* [*v. Pilgrims Films & Television, Inc.*, 659 F.3d 975 (9th Cir. 2011)], one of the plaintiffs, Larry Montz, "conceived of an idea for a television show that would follow a team of paranormal investigators conducting field investigations." 649 F.3d at 977. He pitched the idea to NBC and the Sci–Fi channel, but the studios declined. Years later, however, NBC produced a series on the Sci–Fi channel that appeared to be based on Montz's pitch. Montz, along with publicist and producer Daena Smoller, filed suit alleging, inter alia, "that plaintiffs presented the concept on the express condition that they made the presentation as an offer to partner with the defendants and that plaintiffs justifiably expected to receive a share of the profits derived from any use of the idea." *Id.* at 978. The court stated that according to the plaintiffs' allegations, they presented their ideas pursuant to entertainment industry custom and alleged that "compensation was expected in accord with industry practice." *Id. The court reversed the trial court's dismissal of the claim, stating that it saw "no meaningful difference between the conditioning of use on payment ... and conditioning use ... on the granting of a partnership interest in the proceeds of the production."* *Id.* at 977. ... *Montz* and the cases preceding *Montz* demonstrate that an idea offeror can state a claim for theft of idea if, based on an objective standard, he discloses an idea with the reasonable expectation that he will be compensated for the offeree's use of that idea. *However, this compensation need not consist of an outright purchase. It could consist of any arrangement in which the offeror is compensated because the offeree elected to accept and use the idea, such as a profit-sharing arrangement or some other compensation structure.*

…

Accordingly, the Court in *4Bowl* held that a proposed "partnership arrangement" by which "both Parties would be financially compensated" qualified as expected compensation supporting an idea misappropriation claim. *Id.* at *6. Disney cites no authority that a screenwriter position does not constitute compensation for that purpose, and Disney's argument defies common sense. Writers propose projects for compensation and so that they will be produced. To effectively condition payment on a writer *not* seeking a position with the production of his idea would disqualify most, if not all, idea misappropriation claims.

Disney's argument, that "whether Disney solicited Scott's alleged ideas for

the reboot makes no difference," is simply wrong.  A request for a submission is evidence of an agreement to pay for an idea.  *Gunther-Wahl Productions, Inc. v. Mattel, Inc.*, 104 Cal.App.4th 27, 43 (2002); see also *Thompson v. California Brewing Co.*, 150 Cal.App.2d 469, 473 and n.4 (1957).  Although Scott cited that case for that proposition in his opposition to Disney's earlier motion to dismiss, Disney makes no effort to distinguish it in the instant motion, so it is fair to conclude that it cannot do so.

Disney's contention, that its own well-publicized policy prohibiting it from accepting unsolicited material is irrelevant, is incorrect.  An idea misappropriation claim is based on an agreement implied from the circumstances.  In *Gunther-Wahl Productions*, *supra*, the court held that a jury instruction that plaintiff must have "clearly conditioned" his submission on payment was improper.  The court reversed because "[t]he agreement of sale may be inferred by the circumstances," citing *Minniear v. Tors*, 266 Cal.App.2d 495, 502 (1968).  Disney's policy is such a circumstance, because it arguably implies that when Disney solicits ideas, it does so with the understanding that it will have to pay for them.  Otherwise, there would be no reason for its policy.  Discovery will establish whether the purpose of the policy is to avoid liability for unsolicited ideas and, therefore, whether the policy implies that Disney understands that it has to pay for solicited ideas that it uses.

Disney's argument that the reboot is not substantially similar to the ideas that Scott submitted is based on the argument that the ideas were not protectible because they were already available in some form to Disney.  However, copyright-type protectability is not an element of a misappropriation claim.  *Benay v. Warner Bros. Entertainment, Inc.*, 607 F.3d 620, 631 (9th Cir. 2010) ("[h]owever, from the invocation of the copyright term 'substantial similarity' it does not follow ... that plaintiffs in idea-submission cases must prove substantial similarity of copyright-protected elements.  Rather, because the claim is based in contract, unauthorized use can be shown by substantially similar elements that are not protected under

1  copyright law" (citations and internal quotes omitted)).

2      Disney's argument, that Scott's ideas already were available to Disney, also

3  raises questions of fact that are not amenable to dismissal at the pleadings stage.

4  Indeed, the case upon which Disney primarily relies, *Quirk v. Sony Pictures Ent.,*

5  *Inc.*, 2013 WL 1345075 (N.D. Cal. 2013) was a summary judgment case decided

6  *after* the court denied a motion to dismiss.  (*Id.* at *10).  There, plaintiff claimed that

7  defendant had used his ideas in a book he wrote.  Plaintiff's claims failed because he

8  could not show that defendants obtained his book from his agents under

9  circumstances showing an implied agreement, and because plaintiff had voluntarily

10  widely disseminated his ideas to the public before defendants allegedly used them.

11  Here, Scott's idea misappropriation claim is based on his 2016 presentations.  That

12  those presentations referenced and included material from the prior episodes is not

13  determinative, including because they also included new material for a new project.

14  Disney's remaining arguments concerning the extent to which Disney used Scott's

15  ideas also are questions of fact that will require discovery, including as to Disney's

16  development of the reboot and its internal discussions concerning Scott's ideas.

17      Disney's statute of limitations argument also fails.  Disney disingenuously

18  presumes that Scott's only idea was to create a reboot, when, in fact, he presented

19  detailed ideas about the substance of a reboot.  It also ignores the discovery rule.

20  *Lyons v. Michael & Associates*, 824 F.3d 1169, 1171 and 1173 (9th Cir. 2016)

21  (discovery rule applies to federal litigation, and provides that statute of limitations

22  does not begin to run until the plaintiff knows or has reason to know of the injury

23  which is the basis of the action;") see also, e.g., *Cooley v. Penguin Group (USA)*

24  *Inc.*, 31 F.Supp.3d 599, 612 (S.D.N.Y. 2014) (public exhibition of infringing

25  material did not constitute notice of copyright infringement claim).  Scott could not

26  have learned that Disney misappropriated his ideas until he viewed the reboot,

27

28

1   which premiered no earlier than March 23, 2018[5].  Whether he should have seen
2   Disney's vague press releases, which contained no details about the reboot, or the
3   articles that repeated them, when he could or should have seen them, and whether
4   the articles were sufficient to provide notice that Disney was using his ideas, are
5   questions of fact.

6        Finally, the cases upon which Disney relies, *Spinner v. American*
7   *Broadcasting Companies, Inc.*, 215 Cal.App.4[th] 172 (2013) and *VMG Salsoul, LLC*
8   *v. Ciccone*, 824 F.3d 871 (9th Cir. 2016) were summary judgment cases, decided
9   after discovery and based on facts, not pleadings.  "Given the fact-specific nature of
10   the question of contract formation, and the emphasis on the facts and circumstances
11   of the idea disclosure," those issues cannot be resolve without facts.  *4Bowl, LLC*,
12   *supra*, 2012 WL 13008127 *6.

13   **V.    FRAUDULENT CONCEALMENT**

14        In its order on Disney's earlier motion to dismiss, the Court held that the first
15   amended complaint did not identify the "who, what, when, where and how" of
16   Disney's executives false representation "that Disney would pay him for his ideas
17   for elements of the reboot and consider offering him an opportunity to work on the
18   reboot in good faith."  [DE 45, p. 12]  The SAC pleads those elements with
19   particularity.  Paragraph 97 alleges that, on March 4, 2016, Disney executive Alyssa
20   Cooper Sapire ("Sapire") emailed Scott, "Would you send us a one sheet on the new
21   creative direction you intend to take the show. … This will help us move the project
22   forward."  Paragraph 97 further alleges that Sapire and two other Disney executives
23   identified by name who were copied on the email, Joe D'Ambrosia and Dennis
24   Venizelos, knew and concealed that they had no intention to "move forward" with
25   Scott because they were already assembling a team for the reboot that did not
26   include Scott, and had no intention to pay Scott for his ideas, which they intended to

27
28

KING, HOLMES,
PATERNO &
SORIANO, LLP

---

[5] [Muppet Babies (2018 TV series) - Wikipedia](#)

use.  Paragraph 99 also alleges that Scott reasonably relied on the Disney executives' misrepresentations by submitting his ideas at their request.

Those allegations include the misrepresentation—that Disney was considering a project with Scott; who made the misrepresentation—Sapire and her colleagues; when the representation was made—March 4, 2016; and how and where it was made—in an email.  The allegations show reliance—Scott submitted his ideas.  The allegations show that the Disney executives' representation that they were considering moving forward on the new *Muppet Babies* project with Scott were false.  The allegations show why the representation was false and how the Disney executives knew it was false—because Disney already was assembling a team that did not include Scott.  The allegations show that Disney concealed that essential fact from Scott in order to induce him to submit his ideas.  Disney's speculation, that it solicited Scott's ideas simply for "evaluative purposes" (whatever that means) presents a factual issue, not a pleadings one.

## VI.  CONCLUSION

For each of the foregoing reasons, this Court should deny the instant motion, in its entirety.

DATED:      August 22, 2022           KING, HOLMES, PATERNO &
                                       SORIANO, LLP


                                       By:    */s/ Stephen D. Rothschild*
                                       STEPHEN D. ROTHSCHILD
                                       Attorneys for Plaintiffs Howard M. Ehrenberg,
                                       Chapter 7 Trustee, and Jeffrey Scott

KING, HOLMES,
PATERNO &
SORIANO, LLP

16

# EXHIBIT 1

09:32:24   1                      UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3                HONORABLE STANLEY BLUMENFELD, JR., DISTRICT JUDGE

4

5

   HOWARD EHRENBERG, et al.,        )
6                                   )
                 Plaintiffs,        )
7                                   )
                      vs.           )
8                                   )   2:22-CV-1136-SB
   THE WALT DISNEY COMPANY,         )
9                                   )
                 Defendant.         )
10    _____)

11

12

13                      REPORTER'S TRANSCRIPT OF HEARING

14                          Los Angeles, California

15                          Friday, July 15, 2022

16

17

18              _____

19

20

21

22                      AMY DIAZ, RPR, CRR, FCRR
                        Federal Official Reporter
23                      350 West 1st Street, #4455
                        Los Angeles, CA 90012

24

25       *Please order court transcripts here:  www.amydiazfedreporter.com*

1     APPEARANCES OF COUNSEL:

2

     For the Plaintiffs:

3

4               KING HOLMES PATERNO & SORIANO, LLP
               By:  Stephen Rothschild, Attorney at Law
5               1900 Avenue of the Stars, 25th Floor
               Los Angeles, California 90067
6

7

8

9     For the Defendant:

10

               MUNGER TOLLES & OLSON LLP
11               By:  Brandon Martinez, Jr., Attorney at Law
               350 South Grand Avenue, Suite 5000
12               Los Angeles, California 90071

13

14

15

16

17

18

19

20

21

22

23

24

25

1  09:32:25          THE CLERK:  Calling item 7, case number 22-CV-1136,

2  09:32:29   Howard Ehrenberg vs. The Walt Disney Company.

3  09:32:32          Counsel, please state your appearance, starting with

4  09:32:33   the plaintiff.

5  09:32:37          MR. ROTHSCHILD: Good morning, Your Honor.  Steven

6  09:32:40   Rothschild in person for the plaintiffs.

7  09:32:42          THE COURT:  Good morning, Mr. Rothschild.

8  09:32:46          MR. MARTINEZ: Good morning, Your Honor.  Brandon

9  09:32:48   Martinez on behalf of the Defendant The Walt Disney Company.

10 09:32:51          THE COURT:  And Mr. Rothschild, you did receive the

11 09:32:53   Court's minute order where I did actually grant you

12 09:32:55   permission to appear remotely.  I did reflect further and

13 09:32:58   thought under the circumstances my initial reaction was a bit

14 09:33:01   rash.

15 09:33:02          MR. ROTHSCHILD: I did, and I thank you for it.

16 09:33:04   There were other considerations that brought me back home.

17 09:33:07          THE COURT:  Understood.

18 09:33:09          All right.  So the Court has issued a tentative.

19 09:33:12   And at the last proceeding we started the argument, but were

20 09:33:16   not able to proceed much farther.

21 09:33:19          So let me hear, since the tentative is largely

22 09:33:23   against Walt Disney, I'll hear from counsel on that.

23 09:33:27          Before I do so, let me just make sure that everyone

24 09:33:31   is aware, I believe this is being -- this proceeding is being

25 09:33:35   broadcasted.  So there is no photographing, recording,

broadcasting or rebroadcasting or republishing of these
proceedings.  That is all strictly prohibited.

     So let me hear from Disney's counsel.

     MR. MARTINEZ: Thank you, Your Honor.  And I would
just like to extend on behalf of my colleague, Ms. Cox, my
gratitude to the Court and Counsel with respect to last week.

     THE COURT:  Well, I hope she's feeling better.  It
was obvious to the Court that she was attempting to be a good
soldier, so to speak, but was clearly under the weather.

     MR. MARTINEZ: We appreciate that, Your Honor.

     So I have three targeted points I would like to make
with respect to the Court's tentative.

     The first two points concern plaintiffs' claim on
the alleged 1980s contract, and then the third point concerns
the tentative's 12(b)(6) ruling on protectability of
plaintiffs' alleged contributions to the *Muppet Babies*
series.

     I'll start with the 1980s contract claim on which I
have a couple of points.

     On page 10, the Court's tentative concludes that
plaintiffs have stated a viable claim for breach of contract
based on the premise that they have alleged a purely oral
contract between Mr. Scott and Marvel.  We don't read the
First Amended Complaint, or understand the First Amended
Complaint to allege an oral agreement between -- or at least

09:34:58  1  a purely oral agreement between Mr. Scott and Marvel.

09:35:02  2          And that point is underscored, Your Honor, by page

09:35:06  3  18 of plaintiffs' opposition brief, in which they

09:35:09  4  characterize -- in which they don't characterize their 1980s

09:35:15  5  contract as an oral contract, but rather, as a "partly oral

09:35:20  6  and partly implied agreement."

09:35:22  7          They then go on, on page --

09:35:26  8          THE COURT:  What is the difference between partly

09:35:27  9  oral and partly implied, and an oral agreement that has

09:35:31  10  implied terms?

09:35:33  11          MR. MARTINEZ: Your Honor, I don't think there is a

09:35:36  12  difference between those two concepts.  I think that the

09:35:39  13  difference I'm trying to highlight is that the tentative

09:35:43  14  rests on the premise -- this portion of the tentative, I

09:35:45  15  should say -- rests on the understanding that plaintiff is

09:35:47  16  alleging an oral agreement; some of the terms of which happen

09:35:51  17  to be reflected in writings that Mr. Scott had rejected.

09:35:54  18          That is very different from a contract between the

09:35:58  19  parties, some terms of which were oral and some terms of

09:36:01  20  which were implied by conduct.

09:36:03  21          THE COURT:  Well, let me just pause you for a

09:36:05  22  moment.

09:36:05  23          Mr. Rothschild, which is it?

09:36:07  24          MR. ROTHSCHILD: Your Honor, this is a little bit

09:36:11  25  above my head.

1 09:36:12        The fact is that there were oral discussions that

2 09:36:15  resulted in an agreement that Mr. Scott would write scripts

3 09:36:18  for certain compensation.  There was an exchange of writings

4 09:36:21  that had some terms in it that were not implemented, that had

5 09:36:26  some terms in them that were implemented, that he wrote the

6 09:36:29  show for several years, that they paid him pursuant to the

7 09:36:33  understanding of the agreement, and that Disney didn't.

8 09:36:37        Whether you -- how many angels can dance on the head

9 09:36:42  of a pin in terms of how you characterize it, the bottom line

10 09:36:48  is there were terms, there was an agreement, there was

11 09:36:52  performance.

12 09:36:53        THE COURT:  Well, I appreciate the analogy here, but

13 09:37:01  let me just use one that is more legalistic, and that is:

14 09:37:05  You are the master, your client is the master of the

15 09:37:07  Complaint, and your client has an obligation to assert a

16 09:37:12  well-pleaded claim.

17 09:37:13        And what is the well-pleaded claim?  Is it a breach

18 09:37:18  of an oral agreement, a breach of a written agreement, a

19 09:37:21  breach of an implied agreement, none of the above?

20 09:37:24        MR. ROTHSCHILD: Breach of an oral agreement.  And to

21 09:37:29  the extent that the oral agreement didn't cover every term,

22 09:37:35  the performance of the parties creates an implication that

23 09:37:39  they agreed to those terms because they abided by them.

24 09:37:43        I think, as Your Honor's tentative characterizes it,

25 09:37:48  I think that is accurate.

1 09:37:51      THE COURT:  So under what legal theory would the

2 09:37:56  subsequent conduct form the basis for the agreement, and what

3 09:38:01  type of agreement would it be?

4 09:38:03      MR. ROTHSCHILD: Again, it's an oral agreement, and

5 09:38:06  it was ratified by conduct consistent with the oral terms of

6 09:38:12  the agreement.

7 09:38:13      THE COURT:  So your theory is that this was an oral

8 09:38:18  agreement, and the terms of the agreement were reflected in

9 09:38:22  the oral exchange on the terms, and then to the extent that

10 09:38:27  there were some terms that were not filled in directly

11 09:38:31  through the oral exchange, the subsequent conduct fills in

12 09:38:36  those voids?

13 09:38:37      MR. ROTHSCHILD: Yes.

14 09:38:38      THE COURT:  But ultimately, it's an oral agreement?

15 09:38:41      MR. ROTHSCHILD: Correct.

16 09:38:41      THE COURT:  All right.  Let me return to

17 09:38:43  Mr. Martinez.

18 09:38:45      MR. MARTINEZ: I would just say, Your Honor,

19 09:38:46  respectfully, if the contention is that there -- that the

20 09:38:51  parties -- one party made a proposal of terms orally, and

21 09:38:54  then the counter party agreed to them, that would be an oral

22 09:38:58  agreement, and there would be nothing exotic about that.

23 09:39:00      But the contention here is that the parties agreed

24 09:39:02  to some terms orally, we don't know which ones, but then

25 09:39:07  manifested intent to agree to a whole set of other terms,

1 09:39:10  which also aren't specified in the Complaint, by unspecified
2 09:39:15  conduct.
3 09:39:15          THE COURT:  Tell me, Mr. Martinez, why this is
4 09:39:18  exotic.
5 09:39:20          Let's assume the parties have entered into an
6 09:39:24  agreement, written or oral, where there is at least the
7 09:39:29  fundamentals of the contract itself, so that it is an
8 09:39:34  enforceable contract, but they are light on details.
9 09:39:41  Doesn't -- isn't there an entire body of law that allows
10 09:39:45  courts to basically fill in the details, looking also, at
11 09:39:49  least in part, on the parties' conduct?
12 09:39:53          MR. MARTINEZ: In an ordinary case, that might be the
13 09:39:54  case, Your Honor, a general principle we might apply.
14 09:39:57          But what is exotic about this alleged agreement is
15 09:40:00  that it allegedly contained terms that entitled Mr. Scott to
16 09:40:05  a whole raft of rights in perpetuity with respect to the
17 09:40:10  *Muppet Babies* series.
18 09:40:13          Their allegation in paragraph 14 of the Complaint is
19 09:40:15  that Mr. Scott was entitled to a royalty in perpetuity, a
20 09:40:19  right of first refusal with respect to writing every future
21 09:40:23  episode of the *Muppet Babies* ever produced, and also a
22 09:40:26  perpetual screen credit.
23 09:40:29          THE COURT:  And so Mr. Martinez, do you understand
24 09:40:30  that aspect of this agreement to have been as part of the
25 09:40:36  oral agreement where the parties had an oral discussion, or

1 09:40:39   do you understand that to be subsequent conduct or details

2 09:40:44   that were later fleshed in -- fleshed out, I should say.

3 09:40:49        MR. MARTINEZ: The Complaint isn't clear.  It doesn't

4 09:40:51   specify which terms were oral and which were implied.

5 09:40:53        It appears, based on plaintiffs' characterization

6 09:40:56   here, and also in the briefing, and in paragraph 14 of the

7 09:40:59   Complaint, that the rights in perpetuity apparently were

8 09:41:04   implied by the conduct of the parties.

9 09:41:06        And as Your Honor knows from the handling of the

10 09:41:10   explicit -- Mr. Scott's explicitly implied claim, the *Desny*

11 09:41:15   misappropriation claim, in order to state a claim for an

12 09:41:16   implied contract or a partly implied contract, the plaintiff

13 09:41:19   has to plead and prove conduct by both parties manifesting

14 09:41:24   intent to be bound by the alleged terms of that implied

15 09:41:27   agreement.

16 09:41:28        If it's the -- it appears to be the case that their

17 09:41:32   contention is that Marvel manifested intent somehow to be --

18 09:41:37   to give Mr. Scott a series of rights in perpetuity.  And we

19 09:41:42   don't think plaintiff has stated anywhere near sufficient

20 09:41:45   facts to state that kind of a claim.

21 09:41:47        So I would just say, Your Honor, I understand from

22 09:41:49   the Court's tentative that the Court might be disinclined to

23 09:41:52   dismiss the case -- sorry, this claim with prejudice, but we

24 09:41:55   do think the serious ambiguity merits at the very least

25 09:42:00   dismissing the claim with leave to amend.  So that -- along

09:42:04  with all the other claims, which the Court is already

09:42:09  dismissing, so that plaintiffs can specify the nature of the

09:42:12  contract they are alleging, first of all.

09:42:14      And also, more importantly, specify which parts were

09:42:17  implied and which parts were allegedly oral.

09:42:20      THE COURT:  Can't you find that information out

09:42:22  readily in discovery?  And I realize that is not always an

09:42:27  answer, or shouldn't always be an answer to potential

09:42:30  ambiguity in a motion to dismiss, but what are we doing here?

09:42:34      MR. MARTINEZ: So, Your Honor, we -- to your point,

09:42:37  as you alluded to earlier, the plaintiff has an obligation to

09:42:40  state a claim before we commence discovery.  And our view is

09:42:45  they haven't stated a claim because there is not even a clear

09:42:48  articulation of what the alleged contract is or what it

09:42:51  consisted of.

09:42:52      THE COURT:  Would it make a difference to you if you

09:42:55  learned that I'm expecting this case to move on and there is

09:42:59  going to be discovery?

09:43:01      MR. MARTINEZ: Respectfully, Your Honor, Disney's

09:43:06  intention, since the Court is dismissing the other claims,

09:43:08  Disney's intention is to move on a second 12(b)(6) motion.

09:43:12      Obviously, we understand that discovery, in all

09:43:15  likelihood, is not going to be stayed for purposes of that

09:43:18  motion.  But it does seem to us that because they haven't

09:43:20  stated a claim on -- stated a claim, because the Court is

1 09:43:24   dismissing the other three, including an explicitly implied

2 09:43:28   contract claim on essentially the same ground, that plaintiff

3 09:43:31   needs to articulate the bases for their claim, it makes sense

4 09:43:34   to us to require plaintiff to plead this claim with

5 09:43:38   particularity.

6 09:43:39          THE COURT:  Unless you have something further with

7 09:43:42   regard to that point, let me hear your next point.

8 09:43:46          MR. MARTINEZ: The next point also relates to the

9 09:43:50   claim on the alleged 1980s contract.

10 09:43:52          And that point is that any rights in perpetuity to

11 09:43:56   which I referred earlier, that Mr. Scott may have enjoyed

12 09:43:59   under that alleged 1980s contract, were extinguished

13 09:44:04   prospectively by a 1990 agreement that Mr. Scott entered into

14 09:44:09   with Marvel several years later.

15 09:44:11          THE COURT:  And this is the 1990s Storyperson

16 09:44:15   Agreement?

17 09:44:15          MR. MARTINEZ: That's right.  And that is attached as

18 09:44:17   Exhibit C to the Myers' declaration.

19 09:44:19          THE COURT:  Even assuming, for purposes of this

20 09:44:20   discussion, that it's appropriate at this stage for me to

21 09:44:25   look at that agreement, explain to me how it accomplishes

22 09:44:29   what you claim it does.

23 09:44:31          MR. MARTINEZ: Yes, Your Honor.

24 09:44:33          THE COURT:  And you should be aware, Mr. Martinez,

25 09:44:34   that I have reviewed the agreement, I have reviewed the

integration clause, and it does appear to me, at least

arguably, that the subject matter of that agreement was two

scripts.

And if that is true, then how is it that the

integration clause worked in the way that you describe?

MR. MARTINEZ: So the principle, the legal principle,

Your Honor, at play under California law is that a second

contract between the same parties extinguishes any

inconsistent rights prospectively.  And so that is exactly

the situation we have here.  And I'll explain why I think the

1990 Person Agreement accomplishes that.

Mr. Scott alleges that he has a series of rights in

perpetuity under that alleged 1980s contract.  Regardless

whether those rights came from implied terms or oral terms,

the 1990 agreement extinguished those terms.  And that is

because that agreement, that 1990 agreement, provided for a

fixed, one-time set of benefits to be conferred on Mr. Scott.

It did not provide and did not mention any alleged

rights in perpetuity that Mr. Scott supposedly already

enjoyed under his 1980s contract with Marvel.

And so our contention isn't that -- I think there

was a lot of ink spilled in plaintiffs' opposition about

whether the 1990 agreement like applies to Mr. Scott's

scripts that he wrote in the 1980s, or his rights with

respect to those scripts.  That is missing the point.

1 09:46:21       The point is that there is a second contract between

2 09:46:24  the exact same parties, or -- well, there is a contract --

3 09:46:29  whether it was the second -- assuming it's true that there

4 09:46:31  was a 1980s one, there is a second contract between the same

5 09:46:35  parties, and it's -- and the rights contained in that second

6 09:46:39  agreement are inconsistent with the rights that Mr. Scott

7 09:46:42  alleges he enjoyed under the prior one.

8 09:46:44       THE COURT:  Are they inconsistent to the extent that

9 09:46:48  you are suggesting, Mr. Martinez?  To spell out the question:

10 09:46:55  Arguably, it is inconsistent to say that with respect to

11 09:46:59  these two scripts, that Mr. Scott preserved all of the rights

12 09:47:06  that he claims he received orally, again, with regard to

13 09:47:11  these two scripts.

14 09:47:13       But if the focus is only on these two scripts, then

15 09:47:17  why would it extinguish other rights that don't apply to

16 09:47:22  those two scripts?

17 09:47:24       So let me make sure that I understand your argument,

18 09:47:26  and let me spell it out even further.  There are 80 prior

19 09:47:31  scripts, whatever the number is, that he worked on.  He

20 09:47:34  claims that he has a copyright, intellectual property rights

21 09:47:40  on that, he has in perpetuity rights on all of those, and

22 09:47:44  including on scripts that he prepares in the future.

23 09:47:48       And so now in 1990, he has -- enters into an

24 09:47:54  agreement with two scripts where he should be able to rely

25 09:47:57  upon that prior agreement, other than perhaps to make some

1 09:48:03   adjustments with costs for the scripts or the like, but he

2 09:48:07   should be able to rely upon that agreement because that is

3 09:48:09   what he agreed to; and yet, he didn't.  He arguably limited

4 09:48:13   his rights with regard to these two scripts.

5 09:48:16          Does that mean he also cut off the rights with

6 09:48:19   regard to all of the previously-written scripts?

7 09:48:21          MR. MARTINEZ: It does, Your Honor, because it's a

8 09:48:24   second agreement concerning -- the alleged 1980s agreement

9 09:48:30   apparently concerned -- governed Mr. Scott's rights with

10 09:48:33   respect to future episodes of the *Muppet Babies*.

11 09:48:36          The second contract, the 1990s Storyperson

12 09:48:40   Agreement, did exactly the same thing.  It set out terms for

13 09:48:42   Mr. Scott's future work on episodes of the *Muppet Babies*.

14 09:48:45          So it's important not just to look at what the 1990

15 09:48:48   Person Agreement says.  Obviously, it says -- it provides, We

16 09:48:51   are going to give you a fixed fee for your work with respect

17 09:48:54   to these two episodes.  But also what it doesn't say.  It

18 09:48:57   doesn't preserve some alleged right in perpetuity to write

19 09:49:02   all future episodes, or to receive a royalty, or to receive a

20 09:49:05   screen credit.

21 09:49:07          And in that sense, the two are, the two agreements,

22 09:49:09   the second agreement and the alleged first agreement, are

23 09:49:12   inconsistent.

24 09:49:13          THE COURT:  I'll ask you this last question, and

25 09:49:15   then let's move on to another point, because I think I

109:49:19   understand.

209:49:20          What I think I hear you to be saying is not so

309:49:24   much -- you wouldn't put it this way -- not so much that

409:49:30   they're fundamentally inconsistent to the point where the

509:49:34   integration clause necessarily snuffs out the prior

609:49:38   agreement, but they are sufficiently inconsistent that it

709:49:40   raises serious doubt about the purported oral agreement.

809:49:47          Disney claims there was no such oral agreement, this

909:49:49   is all fantasyland, right?

1009:49:52          MR. MARTINEZ: It is our contention that there was no

1109:49:55   such oral agreement.  That's correct, Your Honor.

1209:49:56          I don't know if I would -- obviously, it is our

1309:50:01   position that the 1990 agreement does more than create

1409:50:03   serious doubt.  It does snuff out the agreement -- the

1509:50:06   alleged 1980s agreement.

1609:50:08          THE COURT:  But the point is that the 1990 agreement

1709:50:13   casts serious doubt on the credibility of the purported oral

1809:50:18   agreement.

1909:50:19          That is Disney's position, at least as a backup,

2009:50:24   correct?

2109:50:24          MR. MARTINEZ: At least as a backup, Your Honor.

2209:50:26          THE COURT:  All right.  Move on to the next.  I'm

2309:50:28   not sure that it at this point provides you with more than

2409:50:32   that.

2509:50:32          But as I said previously, Mr. Martinez, my overall

1  09:50:35  impression is, while I respect your client's right to file a

2  09:50:40  700-page with all kinds of extrinsic evidence motion to

3  09:50:44  dismiss, this motion strikes me as being ambitious.

4  09:50:48          MR. MARTINEZ: I understand, Your Honor.  I'll move

5  09:50:50  on to my third and final point.

6  09:50:51          And that concerns the tentative ruling on the

7  09:50:54  protectability of Mr. Scott's alleged contributions to the

8  09:50:58  series.  That is on pages 7 and 8 of the tentative, I

9  09:51:01  believe.

10  09:51:01          I would like to focus on a prong or a principle of

11  09:51:05  the protectability analysis that doesn't appear to be

12  09:51:08  addressed in the tentative, but that we think is very

13  09:51:11  important.

14  09:51:11          And that is the principle that in order to be

15  09:51:14  copyrightable, the original aspects of a derivative work must

16  09:51:18  not in any way affect the scope of any copyrighted protection

17  09:51:22  in the underlying preexisting material from which the

18  09:51:27  derivative work is derived.

19  09:51:29          So in other words, the author of an allegedly

20  09:51:33  authorized derivative work can't assert a copyright over

21  09:51:37  the -- you know, the allegedly original material in the

22  09:51:39  derivative work that would impinge upon or abridge a prior

23  09:51:46  party's preexisting copyright in the original underlying

24  09:51:48  work.

25  09:51:49          Your Honor cites that principle on, I think on page

8 of the tentative.  But what I -- the reason I raise it here
is because the preexisting material here obviously is the
Muppets as characters, and that includes the Muppets as
babies, as featured in *The Muppets Take Manhattan*.

So the scope of any copyright that Mr. Scott or the
Trustee are asserting here, cannot infringe or abridge or
impinge upon the scope of Disney's preexisting copyright in
the Muppets characters, including the Muppets as babies.

THE COURT:  I know you are going to get there, but
maybe you can get there right away:  How does it do so here?

MR. MARTINEZ: So if Mr. Scott's contention is that
he owns the copyright to the *Muppet Babies* series, which is
the basis of his -- of the -- of plaintiffs' copyright
claims, that would -- that would essentially eviscerate
Disney's copyright in the Muppets, and also in the Muppets as
babies, because it would -- Disney couldn't exploit the
Muppets, or the Muppets as babies, if Mr. Scott owned a
copyright to the *Muppet Babies* series, which is the basis of
his claim.

So that can't be right.  That runs headlong into the
*U.S. Auto Parts Network* principle that I just quoted, and
that Your Honor cites in the tentative.

I appreciate that the Court is going to dismiss the
copyright claims on substantial similarity grounds.  The
reason I bring this principle to light, and want to emphasize

1 09:53:27   it for the Court, is because it's relevant to defining the

2 09:53:31   scope of the copyright that we are litigating in this case.

3 09:53:34        Even if you -- even if you conclude that that

4 09:53:37   principle doesn't defeat the copyright claims all together,

5 09:53:41   it at the very least narrows the scope of the alleged

6 09:53:44   copyrights that Mr. Scott is entitled to.

7 09:53:47        And that is going to be very important to a future

8 09:53:50   filtration analysis that the Court will have to undertake as

9 09:53:54   part of a substantial similarity analysis.

10 09:53:57        And then because you are going to only -- as part of

11 09:54:00   a substantial similarity analysis, the Court's only going to

12 09:54:03   be comparing the protectable, original parts of Mr. Scott's

13 09:54:06   alleged contributions to the allegedly infringing work.

14 09:54:09        So my only final point on this is I think the

15 09:54:14   tentative suggests that the original -- or the protectability

16 09:54:18   analysis is something that needs to be reserved for summary

17 09:54:21   judgment or for trial.  The substantial -- the filtration and

18 09:54:26   substantial similarity analyses, which sort of subsume the

19 09:54:29   protectability analysis, are something that the Court can

20 09:54:32   resolve on a 12(b)(6) motion.

21 09:54:34        And, you know, I think Disney will ask the Court to

22 09:54:38   conduct that analysis in its next 12(b)(6) motion.

23 09:54:42        THE COURT:  And so tell me what that would look like

24 09:54:44   in the Court's order.  How would that change the Court's

25 09:54:47   order?

1  09:54:47        MR. MARTINEZ: So with respect to -- so like I guess
2  09:54:53   it would change it in two immediate ways:
3  09:54:55        The first is that the Court would -- and I'm
4  09:54:59   referring to sort of the middle paragraph on page 8, that
5  09:55:02   would be I think where the change might take place -- but the
6  09:55:05   change would be to winnow down the scope of the alleged
7  09:55:10   copyright that Mr. Scott could possibly be entitled to as a
8  09:55:13   matter of law, to exclude anything that would undercut or
9  09:55:19   impinge upon Disney's preexisting copyright in the Muppet
10 09:55:23   characters, and in the Muppets as babies.
11 09:55:26        It's sort of unclear, to be frank, Your Honor, what
12 09:55:30   Mr. Scott would have left.  I know Your Honor in the
13 09:55:34   tentative refers to *The Nanny* character.  Assuming, just for
14 09:55:37   purposes of this motion, that it's true that Mr. Scott
15 09:55:41   invented *The Nanny* character, perhaps that would be left
16 09:55:44   over.
17 09:55:46        But anything else, the Muppet characters, the
18 09:55:50   Muppets as babies, Mr. Scott can't possibly claim copyright
19 09:55:54   to those, because that would infringe upon -- or, sorry --
20 09:55:59   impinge upon and abridge Disney's prior preexisting copyright
21 09:56:04   in those characters.
22 09:56:04        THE COURT:  So if I were to adopt what you are
23 09:56:06   suggesting, it would be fairly nebulous as to its
24 09:56:10   implication?
25 09:56:13        MR. MARTINEZ: No.  I think the principle is worth

109:56:16    explicating in the tentative, because it's going to inform

209:56:20    how the Court conducts its next substantial similarity

309:56:23    analysis and filtration analysis, regardless whether that

409:56:27    happens in a second 12(b)(6) motion or at summary judgment.

509:56:30          THE COURT:  But this Court has done a substantial

609:56:32    similarity analysis without giving guidance, and simply made

709:56:36    a determination in the context of the information presented

809:56:40    to it what aspects are protected and what aspects are not

909:56:44    protected.

1009:56:45          So why wouldn't I just do that in the context of a

1109:56:49    substantial similarity analysis?

1209:56:50          MR. MARTINEZ: I think you would in a future

1309:56:52    12(b)(6).  I just think that the principle, although cited in

1409:56:55    the tentative -- and I don't mean to make light of Your

1509:56:59    Honor's tentative -- the principle is cited, but there is

1609:57:03    no -- the Court I fear hasn't addressed this very important

1709:57:07    limitation on the scope of any copyright to which Mr. Scott

1809:57:11    could possibly be entitled in this case.

1909:57:13          THE COURT:  Let me hear from Mr. Rothschild on that

2009:57:16    point.

2109:57:16          MR. ROTHSCHILD: Your Honor, *Muppets Take Manhattan*,

2209:57:20    which is the source of the *Muppet Babies*, contained, I think

2309:57:24    it was a three and-a-half minute segment with the *Muppet*

2409:57:29    *Babies*.

2509:57:29          Mr. Scott wrote, what, 50, 60 hours of episodes and

09:57:36  scripts.  There was a lot more in those 50 or 60 hours, it

09:57:40  may be more, than are in those three and a half minutes.

09:57:44  This isn't just somebody making a new Batmobile that looked

09:57:50  exactly like the old one.

09:57:51       So I guess my point really is it's not a motion to

09:57:55  dismiss issue.  You know, whether -- anything that would

09:58:00  impinge on Disney's copyright is a nebulous concept.  It's

09:58:08  not a 12(b)(6) issue.  It's maybe a summary judgment issue,

09:58:12  maybe a trial issue.

09:58:13       You know, I'm hopeful that we can litigate the case

09:58:16  sufficiently that we can't have -- that we don't have motions

09:58:19  that aren't necessary or that are premature.  And I think

09:58:24  this is that kind of issue.

09:58:26       THE COURT:  Anything further, Mr. Rothschild?

09:58:28       MR. ROTHSCHILD: No.

09:58:29       THE COURT:  Nothing further?

09:58:33       MR. ROTHSCHILD: I guess -- I don't know if it's

09:58:39  necessary, but on this 1990 agreement, again, questions of

09:58:43  fact:  What happened when the people entered into that

09:58:47  agreement?  What was their understanding?  How did they

09:58:49  manifest that understanding?  Not 12(b)(6) issues.  These are

09:58:54  all factual issues that Disney has some documents that they

09:58:59  are going to produce, I hope, in the next couple of weeks.

09:59:04  We'll engage in all of the discovery we need, and they will,

09:59:08  too, and we can develop these issues and litigate them in an

```
 1 09:59:12   efficient and comprehensive manner.
 2 09:59:15          THE COURT:  Mr. Martinez, I'll give you two more
 3 09:59:17   minutes to give you the last word, and then I'm going to
 4 09:59:19   conclude this matter.
 5 09:59:20          MR. MARTINEZ: Okay.  Your Honor, I think that is --
 6 09:59:23   just one last point on this protectability point.  Just that
 7 09:59:26   I do think it's clear under the Benay case, and other cases
 8 09:59:29   we have cited in our opening brief, that the filtration
 9 09:59:32   analysis of anything not protectable, and then the
10 09:59:35   substantial similarity analysis, are inquiries the Court can
11 09:59:39   undertake on a Rule 12(b)(6) motion.
12 09:59:41          That would just be -- again, not to line it -- I
13 09:59:44   think that would be the second change to the tentative, which
14 09:59:47   suggests that that issue is really reserved for later phases
15 09:59:50   of the case.
16 09:59:50          THE COURT:  I have done it before, Mr. Martinez.  I
17 09:59:54   don't intend to do so in this case.
18 09:59:57          Anything further?
19 09:59:57          MR. MARTINEZ: Nothing further on the merits, Your
20 10:00:00   Honor.
21 10:00:00          THE COURT:  All right.  I will take the matter under
22 10:00:03   submission and consider the parties's arguments, and you will
23 10:00:07   receive the Court's ruling in due course.  We are in recess.
24 10:00:17   This matter is concluded.  Thank you.
25                          *****     *****     *****
```

1

2       I certify that the foregoing is a correct transcript from the

3       record of proceedings in the above-titled matter.

4

5

6

7       ---------------------------

8

9       Amy C. Diaz, RPR, CRR              July 20, 2022

10      S/  Amy Diaz

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25